Friendly, Chief Judge, concurred and filed opinion.

Mansfield, Circuit Judge, concurred and filed opinion.

**UNITED STATES of America,
Appellee,**

v.

**Henry BELL, Appellant.**

**No. 830, Docket 72–1322.**

United States Court of Appeals,
Second Circuit.

Argued June 6, 1972.

Decided July 5, 1972.

Michael Young, New York City (Robert Kasanof, The Legal Aid Society, New York City, on the brief), for appellant.

Paul B. Bergman, Asst. U. S. Atty. (Robert A. Morse, U. S. Atty. for the E. D. N. Y., David G. Trager, Asst. U. S. Atty., of counsel), for appellee.

Before FRIENDLY, Chief Judge, and MANSFIELD and MULLIGAN, Circuit Judges.

MULLIGAN, Circuit Judge:

This is an appeal from a judgment of the United States District Court for the Eastern District of New York (Mark A. Costantino, J.) dated December 3, 1971 which convicted the appellant of failure to pay a tax on narcotics in violation of 26 U.S.C. § 4724(c).[1] Judgment affirmed.

On the morning of November 28, 1970 the appellant Henry Bell entered La Guardia Airport and purchased a ticket on Eastern Airlines Flight 101 to Atlanta, Georgia. The ticket seller, Mr. Ralph Whitfield, who had been employed by Eastern Airlines for eight years, was familiar with an antihijacking system which had been developed to identify potential skyjackers. Bell and the circumstances of his ticket purchase fell within the criteria of a "hijacker profile" developed by the Federal Aviation Administration in cooperation with the commercial airlines. He was therefore designated as a "selectee" by Whitfield and his ticket was given to him in an envelope which would identify him at the flight gate as a person who fell within the category of potential hijackers. The ramp ticket agent at Gate 34, the scheduled boarding point for Flight 101, was notified that one of the passengers had been designated as a selectee and a Unit-

---

1. Appellant Henry Bell was originally indicted for violation of the now repealed Narcotic Drug Import and Export Act (21 U.S.C. §§ 173 & 174 (1964)). After his motion to suppress the narcotics was denied by Judge Costantino on November 24, 1971 (United States v. Bell, 335 F. Supp. 797 (E.D.N.Y.1971)), Bell waived re-indictment and consented to the filing of a superseding information charging him with one count of failure to pay tax on the narcotic drugs in his possession.

26 U.S.C. § 4724(c) (1964) (repealed 1971). He then waived his right to a jury trial and agreed to have the two day suppression hearing serve as the trial. On December 3, 1971 Judge Costantino found Bell guilty and continued his bail until the date for sentencing. On January 28, 1972 Bell was sentenced to eight years imprisonment and bail pending appeal was set at $10,000. This court lowered bail to $3,000 pending its determination.

ed States Marshal, John Walsh, was summoned. When Bell arrived at Gate 34, James Demeloitz, the ramp ticket agent, checked his ticket and envelope. As the passengers left the lounge to walk through the jetway which led into the plane, they all passed between two metal poles set about 30 to 36 inches apart. This device known as a magnetometer is designed to detect the presence of metal objects on the person of an embarking passenger. When Bell passed through, the device was activated indicating the presence of metal on his person. Demeloitz then approached Bell, advised him that he had set off the device and requested his ticket as well as identification. United States Deputy Marshal Walsh who was standing next to Demeloitz requested Bell to pass through the magnetometer a second time. Bell complied and again the device registered. Walsh then repeated the request for identification. Bell responded that he had just been released from the Tombs and that he was out on bail for attempted murder and narcotics charges. Walsh identified himself as a Deputy Marshal assigned to the air piracy program and advised Bell that he apparently had some metal on his person. He asked Bell if he minded being "patted down" and the appellant responded "Certainly not." Walsh proceeded behind the closed door of the jetway to pat down Bell from chest to hips and felt hard objects about 4 to 5 inches long in his raincoat pockets. Bell described the objects as candy for his mother and agreed to take one out of his pocket. It was a brown paper bag which he again described as candy for his mother but which when opened at Walsh's request, was seen to contain glassine envelopes which Walsh believed to contain narcotics. Bell was then arrested and a search thereafter revealed that the bulge in the other pocket was a similar bag. A field check at the airport revealed that the 600 glassine envelopes in the bags contained heroin.

At the pretrial suppression hearing, the government produced ticket agents Whitfield and Demeloitz and Deputy Marshal Walsh as well as Mr. Fred Trommsdorff, airport passenger service manager at La Guardia Airport at the time of this incident, and Michael A. Pizzi, a Deputy United States Marshal who was in charge of the federal antihijacking program at both La Guardia and Kennedy airports. Over the objection of counsel for the defendant, Judge Costantino granted the government's motion to hear the testimony of ticket agent Whitfield at an *in camera* proceeding from which the defendant and the public were excluded. Counsel for defendant was permitted to remain and take part in the proceedings. This procedure had been previously utilized by Judge Weinstein in the Eastern District of New York, United States v. Lopez, 328 F.Supp. 1077 (1971), in which trial counsel for defendant here had also appeared for Lopez. In that case, although the *in camera* procedure was found to be constitutional, the indictment was dismissed for other reasons so that the constitutional issues raised by the appeal here are before this court for the first time.

I

Appellant argues that his fifth and sixth amendment constitutional rights were infringed by the *in camera* procedure employed below. Specifically, he urges that he was denied the right to confront the witnesses against him, to the effective assistance of counsel and to the right to a public trial.

The government's justification for the barring of the public and the defendant, while permitting his counsel to participate, is based upon the compelling urgency of protecting the confidentiality of the profile which has been devised as a method to reduce the threat of hijacking. We need no citation of authority or statistics to establish that domestic and international hijacking of airplanes poses a continuing hazard to public travel. Human life and property have been jeopardized by the mentally ill, the political terrorist and the criminal extortioner who have in recent years discovered

that an airplane in flight, despite all of its engineering sophistication, is a uniquely fragile and vulnerable target when a passenger or crew member is threatened by a weapon or an explosive. This escalating criminal phenomenon of our times has stirred public apprehension and official concern. The Federal Aviation Administration in conjunction with other federal agencies conducted studies essentially based on the characteristics of those who had engaged in such ventures before. A list of criteria was compiled based upon the characteristics of the hijacker and the circumstances of his ticket purchase. The profile so constructed based on scientific, sociological and psychological data can be readily and objectively employed by the ticket seller without requiring any subjective interpolation. The profile, according to sizeable samplings, selects less than 1% of the passengers as possible hijackers.[2] Bell was the only selectee on the flight in question.

This appeal was argued in a courtroom which was cleared of spectators and limited to counsel. The profile was disclosed and this court is fully persuaded that it would not only be possible but relatively simple for a prospective hijacker to avoid the initial designation were any of the norms employed to become generally known. It is not only highly desirable but essential, if the profile system is to continue, that it be kept confidential. While this premise may be unquestioned, it is of course only prelude to the issue as to whether or not the *in camera* proceeding infringed the appellant's rights.

▉ Barring the public including the press from the suppression hearing in this case presents no great constitutional difficulty. While secret proceedings are of course odious and smack of ideologies as repugnant to the Founders as they are today, there is precedent for the proposition that limited exceptions are constitutionally permissible. Thus the exclusion of the public in whole or in part has been found constitutionally acceptable where it was deemed necessary to protect the defendant, Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965), where there has been harassment of witnesses, United States ex rel. Bruno v. Herold, 408 F.2d 125 (2d Cir. 1969), cert. denied, 397 U.S. 957, 90 S. Ct. 947, 25 L.Ed.2d 141 (1970), or to preserve order, United States ex rel. Orlando v. Fay, 350 F.2d 967 (2d Cir. 1965), cert. denied, 384 U.S. 1008, 86 S. Ct. 1961, 16 L.Ed.2d 1021 (1966). The justification for the limited exclusion here in our view, protection of the air travelling public, presents at least as substantial a consideration as those which prompted the previously recognized exceptions.

The claim that Bell was denied the sixth amendment right "to be confronted with the witnesses against him" is of more substance but on analysis is not supportable. The scope of the sixth amendment right of confrontation has not yet been precisely defined and Mr. Justice Harlan, in his typically scholarly concurrence in California v. Green, 399 U.S. 149, 174, 90 S.Ct. 1930, 1943, 26 L. Ed.2d 489 (1970), has commented that history gives us "very little insight into the intended scope of the Sixth Amendment Confrontation Clause." However, the Supreme Court in Mattox v. United States, 156 U.S. 237, 242–243, 15 S.Ct. 337, 339, 39 L.Ed. 409 (1895) did note:

"The primary object of the constitutional provision in question was to prevent depositions or *ex parte* affidavits, such as were sometimes admitted in civil cases, being used against the prisoner in lieu of a personal examination and cross-examination of the witness in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him

---

2. For a description of the development, effectiveness and continuing re-evaluation of the profile see Judge Weinstein's opinion in United States v. Lopez, 328 F. Supp. 1077, 1084, 1086 (E.D.N.Y.1971).

to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief."

We are mindful here that Whitfield, the only witness examined out of the presence of the defendant Bell, testified under oath in the presence of the trial judge who was the finder of the facts at the suppression hearing. The trial court did have in fact a face to face encounter with the witness and the opportunity to observe his demeanor and judge his credibility. Moreover, Bell's counsel had the same opportunity and in fact did cross-examine Whitfield on behalf of his client. This was not the extra judicial statement of the unavailable witness which normally provokes the invocation of the confrontation guarantee.

Whitfield's testimony moreover bore no relationship at all to the question of Bell's guilt or innocence of the crime charged. He could not identify the defendant and had no independent recollection of the transaction. Whitfield simply testified to the fact that he knew the criteria of the profile (which he delineated), that the ticket to the flight in question was sold by him, that his identifying number was on the ticket which was introduced into evidence, as well as the envelope distinctively marked to indicate to ramp personnel that the passenger was a selectee, that a passenger who purchased a ticket fit the profile, and that no personal exercise of judgment on his part in determining selectees was involved. While Bell's attorney was enjoined from disclosing the content of the profile, he was specifically advised of his right to consult his client at any stage of the proceeding he wished.[3] Counsel did not take advantage of the opportunity and in view of Whitfield's testimony, it is difficult to imagine what purpose would be achieved by consultation. We have carefully examined Whitfield's testimony and it is apparent that Bell clearly fit the criteria and that if any doubt existed in the mind of counsel on this point it could have been easily ascertained by consultation with Bell without the necessity of revealing the purpose of the inquiry or identifying the criteria. Bell's counsel was experienced and as we have indicated had already appeared as counsel in a similar case and was presumably already familiar with the profile before the suppression hearing was held.

It is further significant that the exclusion of Bell here was from the suppression hearing and not the trial. Although the minutes of the suppression hearing were later to become the trial record, this was by stipulation of counsel. The suppression hearing is concerned with the legality of the seizure of contraband and not with the question of defendant's guilt or innocence of the charge.

■ At the preliminary hearing, the accused is not afforded many of the same safeguards which are given him on trial. Thus mere hearsay evidence, not admissible to prove guilt at trial, is allowable at the hearing to show that probable cause existed for an arrest or search, Jones v. United States, 362 U.S. 257, 269–271, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); Brinegar v. United States, 338 U.S. 160, 171–174, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949); see 5 J. Wigmore,

---

3. Prior to Mr. Whitfield's direct testimony the court advised defense counsel:

"The Court: . . . .
"Of course you will have the right, if you feel that there is some part of the testimony which has some effect on the knowledge of the defendant, you will have a right to consult with the defendant at any time at any point you think it is necessary. . . . "

At the conclusion of the direct testimony Judge Costantino offered defense counsel an opportunity to consult with the defendant.
"The Court: . . . .
"First of all, is there anything you would like to consult with your client?
"Mr. Kelly: No, I don't think so, Your Honor.
"The Court: I don't think so, either. . . . . "

Evidence § 1385; C. McCormick, Law of Evidence § 53, at 122–23 n. 91 (2d ed. E. Clery 1972); Proposed Fed.R. of Evidence 104(a), Advisory Committee Note, 51 F.R.D. 325 at 326; R. 1101(d) (1) & (3). The Supreme Court in McCray v. Illinois, 386 U.S. 300, 87 S.Ct. 1056, 18 L.Ed.2d 62 (1967), noting the distinction between suppression hearings and trials, upheld the concealment of an informer's identity and rejected the claim that the defendant's right to cross-examination and confrontation had thereby been curtailed.

Here Bell was present and represented by counsel who cross-examined the marshal and the ramp ticket agent who were present at the time of the stop and frisk, which revealed the contraband which led to his arrest. No attack was mounted on the reliability of the criteria of the profile (the ticket agent was clearly not an expert who could defend its validity) or as we have noted on Bell's compliance with its norms.

■ We are left in effect with the question whether Bell's simple physical presence at all stages of the proceedings was mandated by the sixth amendment confrontation clause even though we can perceive no possible prejudice involved in his absence. We find no logical argument or precedential support for such a view. See Snyder v. Massachusetts, 291 U.S. 97, 106–107, 54 S.Ct. 330, 78 L.Ed. 674 (1934). Certainly there was a sound policy reason to exclude Bell. He had been convicted previously of assault with a dangerous weapon in California, of a third degree burglary in Nassau County in 1966 and at the time of his arrest, stated that he was out on bail from the Tombs for attempted murder and narcotics charges. Bell's *curriculum vitae* hardly inspired confidence in his selection as a safe repository of the hijacking profile. The suggestion of counsel that he be permitted to stay in the courtroom but.be enjoined from revealing the profile was properly rejected by the court below. We further note that the Supreme Court has held that the continuing presence of the defendant even on the trial of his case is not an absolute right, e. g., he may waive it, Snyder v. Massachusetts, 291 U.S. 97, 106, 54 S.Ct. 330, 78 L.Ed. 674 (1934); Diaz v. United States, 223 U.S. 442, 453–459, 32 S.Ct. 250, 56 L.Ed. 500 (1912), or his own disruptive behavior may make his removal necessary, Illinois v. Allen, 397 U.S. 337, 90 S.Ct. 1057, 25 L. Ed.2d 353 (1970). The circumstances attending the exclusion here, limited as it was, in our opinion did not jeopardize his ability to confront the witnesses testifying as to his guilt and the incidents surrounding his frisk, or hinder the effectiveness of his counsel's assistance.

## II

■ Appellant also argues that he was the victim of an unlawful search and seizure when he was stopped and frisked on the jetway in the circumstances we have set forth earlier in this opinion. Bell urges that the action of ramp ticket agent Demeloitz who stopped him after the initial activation of the magnetometer and requested his ticket, constituted an unlawful seizure. We cannot agree. The request by the ticket agent for the defendant's envelope and ticket at this point cannot be sensibly characterized as a restraint upon his person. After ascertaining Bell's lack of identification and his criminal background, Marshal Walsh's request that he submit to a pat down did constitute a "stop and frisk" but, in our view, did not offend any fourth amendment rights of the defendant in this case. At this point, Walsh knew that Bell fell into the small category of passengers designated as "selectees"; he had activated the magnetometer, he had no personal identification and he freely admitted that he was out on bail facing narcotics and attempted murder charges. Had Walsh failed to stop Bell he would have been derelict in his duties as a marshal, charged with the responsibility of detecting potential hijackers. His action was eminently sensible and reasonable under the test of Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

The contention of appellant that the use of the magnetometer constituted an unreasonable search is baseless. None of the personal indignities of the frisk discussed by Chief Justice Warren in *Terry* (392 U.S. at 16–17 & n. 13, 88 S.Ct. 1868) are here present. In view of the magnitude of the crime sought to be prevented, the exigencies of time which clearly precluded the obtaining of a warrant, the use of the magnetometer is in our view a reasonable caution. United States v. Epperson, 454 F.2d 769 (4th Cir. 1972). Appellant's contention that the magnetometer in this case was over-sensitive and not properly calibrated is not supported by the record. The testimony of Mr. Trommsdorff, the airport passenger service manager, was that the magnetometer was regularly checked once or twice a week. The fact that a .38 cal. pistol was used to test the device rather than the .25 cal. pistol is not significant since the presumable extra metal of the larger gun was compensated by an adjustment of the calibrating mechanism. Even if the machine were over-sensitive in some measure we fail to see the constitutional significance. This is primarily a matter of the practical effectiveness of the device. If it is over-sensitive, its use becomes self-defeating but it hardly becomes unconstitutional.

The bodily pat down of Bell by Agent Walsh was a frisk fully within the *Terry* test. In *Terry* the Supreme Court rejected the concept that the police officer, conducting a stop and frisk, must have probable cause for making an arrest. There was no arrest here until after the contraband had been discovered. The Supreme Court in *Terry* required something less for the frisk but still required that the police officer have a reasonable belief that some criminal activity might take place and a reasonable belief that the suspect may have a weapon which would present a danger to himself or *others*. Walsh here identified himself to Bell as a United States Marshal assigned to the airplane hijacking problem. He was not acting on a hunch or out of personal pique, and there is nothing to indicate that he was making a general exploratory search. He was an experienced police officer who had not only the objective results of the profile and of the magnetometer, but also an admission of prior criminal behavior.[4] Walsh acted as "a reasonably prudent man in the circumstances . . . warranted in the belief that his safety or that of others was in danger." Terry v. Ohio, 392 U.S. at 27, 88 S.Ct. at 1883.

We do not agree with the contention that the frisk was excessive in scope. We cannot read *Terry* as confining the search to a weapon which might be employed against the officer personally. *Terry,* as we have emphasized, is not so limited, Chief Justice Warren in his opinion mentions the apprehension of the officer for the safety of others as well as himself numerous times.[5] Here, Walsh was charged with the detection of those who would menace their fellow passengers on a flight which was about to depart. Obviously the most appropriate point to conduct the inquiry and to

---

4. Compare United States v. Epperson, 454 F.2d 769 (4th Cir. 1972) where the court upheld a search of the defendant's jacket based upon the activation of the magnetometer alone. As Epperson passed through the instrument it registered an unusually high reading. He was asked to put aside whatever metallic objects he possessed; but when the device was again activated, the United States Marshal searched his jacket and discovered a loaded pistol. In United States v. Lindsey, 451 F.2d 701 (3d Cir. 1971) the level of suspicion which justified the frisk was concededly lower than that in *Terry.*

Noticing Lindsey's anxious behavior as he entered the boarding lounge, the marshal requested to see an identification. The defendant produced four—each bearing a different name. The marshal noted two bulges in the defendant's coat and a subsequent frisk revealed two aluminum-wrapped packages later found to contain heroin. Noting the exigencies of the situation, a panel of the Third Circuit held that the level of suspicion was sufficiently high to justify the stop and frisk.

5. E. g., 392 U.S. at 24, 26, 27, 29, 30, 88 S.Ct. 1868.

make the limited search of outer clothing is on the ground before the takeoff. Once the plane is in flight the pat down is fraught with peril. Moreover, the weapon of the skyjacker is not limited to the conventional weaponry of the bank robber or of the burglar. His arsenal may well include. explosives.[6] When Deputy Marshal Walsh felt hard lumps in both coats about 5 inches by 3 inches, he was clearly correct in requesting Bell to remove one of the objects. The fact that it was a brown paper bag with a rubber band at the top should not have precluded a further look to determine the contents. It could have been gunpowder or some other explosive or deleterious substance which a hijacker might well use to cow the crew and passengers. Since it was contraband it could be seized even though it was not the object of the search, Abel v. United States, 362 U.S. 217, 238, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960); Harris v. United States, 331 U.S. 145, 154–155, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947), overruled on other grounds, Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). The fact that the object was not metal should not have concluded the inquiry.

In *Terry*, Chief Justice Warren in his discussion of the reasonableness test which the court espoused commented that we must first focus " 'upon the governmental interest which allegedly justifies official intrusion upon the constitutionally protected interests of the private citizen,' for there is 'no ready test for determining reasonableness other than by balancing the need to search [or seize] against the invasion which the search [or seizure] entails.' Camara v. Municipal Court, 387 U.S. 523, 534–535, 536–537 [87 S.Ct. 1727, 18 L.Ed.2d 930] (1967)." Terry v. Ohio, 392 U.S. at 20–21, 88 S.Ct. at 1879. The governmental interest here is self-evident. Airplane hijacking is a nasty business from any point of view. Thousands of

innocent passengers have been terrorized and their lives jeopardized by the venal, the political terrorist and the mentally disturbed. The interest in stopping the crime is apparent and the limited intrusion upon Bell's privacy was, in balance, insignificant. Any suggestion that the defendant's constitutional right to travel has been improperly interfered with would be amusing in other circumstances. We are trying to assure that right for the public and the resulting inconvenience of the few should be at least tolerable.

■ Appellant argues that he should have been given the *Miranda* warnings prior to his initial questioning. At this stage there was no obligation to give such warnings. Miranda v. Arizona, 384 U.S. 436, 477–478, 86 S.Ct. 1602, 16 L. Ed.2d 694 (1966). Moreover, counsel made no objection to the admission of any of Bell's pre-arrest statements at the suppression hearing, or at the time it was stipulated that the testimony adduced at the hearing would constitute the trial. This issue therefore is not properly raised on this appeal. United States v. Indiviglio, 352 F.2d 276 (2d Cir. 1965), cert. denied, 383 U.S. 907, 86 S.Ct. 887, 15 L.Ed.2d 663 (1966).

Affirmed.

FRIENDLY, Chief Judge (concurring):

Although my Brother Mulligan's excellent opinion satisfactorily disposes of this case, I would not wish us to be understood as implying that searches of airplane passengers are lawful only in such circumstances as are here presented, where a person first meets a "profile," whose details, however carefully guarded, are necessarily known to so many thousands of people that we may well be reading them someday in the press, and then activates a magnetometer. At least so long as the present wave of airplane hijacking continues, permissible subjection of airline passen-

---

6. See United States v. Epperson, 454 F.2d 769, 771 (4th Cir. 1972) (Fourteen of the eighty instances of air piracy occur-

ring prior to June 1970 involved the use of bombs).

gers and their baggage to a search for objects that might be used for air piracy or to cause or constitute a threat of an explosion goes far beyond this.

The Founders banned only "unreasonable searches and seizures." Determination of what is reasonable requires a weighing of the harm against the need. When the object of the search is simply the detection of past crime, probable cause to arrest is generally the appropriate test. On the other hand, when "a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous," a lower standard prevails. Terry v. Ohio, 392 U.S. 1, 30, 88 S.Ct. 1868, 1884 (1968). The threatened criminal activity in *Terry* was the burglary of a store. When the risk is the jeopardy to hundreds of human lives and millions of dollars of property inherent in the pirating or blowing up of a large airplane, the danger *alone* meets the test of reasonableness, so long as the search is conducted in good faith for the purpose of preventing hijacking or like damage and with reasonable scope and the passenger has been given advance notice of his liability to such a search so that he can avoid it by choosing not to travel by air.[1]

Since all air passengers and their baggage can thus be constitutionally searched, there is no legal objection to searching only some, thereby lessening inconvenience and delay, provided there is no national or racial discrimination without a rational basis (such as the destination of a particular flight). I would thus have no difficulty in sustaining a search that was based on nothing more than the trained intuition of an airline ticket agent or a marshal of the Anti-Hijacking Task Force, as the Third

Circuit did in United States v. Lindsey, 451 F.2d 701 (1971). Moreover, the existence of a program does not preclude the search of someone outside it, whether for some reason, as in *Lindsey,* or because of pardonable error.

In other words, while the Federal Aviation Administration is to be commended for its efforts to devise a program that limits intrusions on privacy and reduces flight delays, this should be recognized as a self-imposed expedient for minimizing inconvenience to those not believed to constitute a danger, not as an element necessary to validate a particular search. And the courts should say nothing that would create doubt concerning the legality of wider or less precise measures when and if these should prove to be needed.

MANSFIELD, Circuit Judge (concurring):

I join in Part I of Judge Mulligan's excellent opinion and agree in addition that the seizure of the heroin from appellant's raincoat was lawful. In view of the concurring opinion of my brother Chief Judge Friendly, however, I feel that additional comment is appropriate.

Airplane hijacking indeed poses a grave threat to the safety and convenience of the travelling public. However, I do not share the view that it justifies a broad and intensive search of all passengers, measured only by the good faith of those conducting the search, regardless of the absence of grounds for suspecting that the passengers searched are potential hijackers. To adopt such a vague principle would be to abandon standards that have been carefully constructed over the years as a means of protecting individual rights guaranteed by the Fourth Amendment. Cf. Carroll v. United States, 267 U.S. 132, 153–154, 45 S.Ct. 280, 69 L.Ed. 543 (1925). If

---

1. Although it may be that when the Government brief was filed "no flight fully protected by the present anti-hijacking screening has been hijacked," the assumption that no person excluded from the profile is a potential hijacker lacks reali-

ty. And reliance on an airline's hunch to refuse "passage to a suspected hijacker" is insufficient as the sole supplementary method of protection, apart from questions of contractual liability.

the danger to the public posed by the current wave of hijackings were held to constitute adequate ground for such a broad expansion of police power, the sharp increase in the rate of serious crimes in our major cities could equally be used to justify similar searches of persons or homes in high crime areas based solely upon the "trained intuition" of the police. With the door thus opened, a serious abuse of individual rights would almost inevitably follow.

History reveals that the initial steps in the erosion of individual rights are usually excused on the basis of an "emergency" or threat to the public. But the ultimate strength of our constitutional guarantees lies in their unhesitating application in times of crisis and tranquility alike. "If the provisions of the Constitution be not upheld when they pinch as well as when they comfort, they may as well be abandoned." Home Building & Loan Assn. v. Blaisdell, 290 U.S. 398, 483, 54 S.Ct. 231, 256, 78 L.Ed. 413 (1934) (Sutherland, J., dissenting).

No necessity exists for punching a hole in the Fourth Amendment in order to enable the FAA and airline authorities to deal effectively with the air piracy problem. As the Government's brief informs us, no flight fully protected by the present anti-hijacking screening system has been hijacked. Furthermore, should there be any increase in the threat of hijackings, airline authorities, in addition to their use of existing methods described in the majority opinion (which are undoubtedly undergoing improvement and refinement on the basis of experience) may protect themselves and the public by refusing passage to a suspected hijacker rather than by subjecting all passengers to the wholesale indignities that would be permitted in the exercise of broad powers of the type urged.

In any event we are neither asked nor required to venture out upon such an uncharted constitutional sea in the present case, where Deputy Marshal Walsh, having sufficient grounds for suspecting Bell of hijacking, had the power to stop and frisk him. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L. Ed.2d 889 (1968). I would prefer not to "anticipate a question of constitutional law in advance of the necessity of deciding it", Ashwander v. TVA, 297 U.S. 288, 346–347, 483, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring).