**UNITED STATES of America, Appellee,**

**v.**

**Theron CLARK, Appellant.**

**No. 527, Docket 72-2147.**

United States Court of Appeals, Second Circuit.

Argued Jan. 12, 1973.

Decided March 8, 1973.

Michael Young, New York City (Robert Kasanof, The Legal Aid Society, New York City, of counsel), for appellant.

Joan S. O'Brien, Asst. U. S. Atty. (Robert A. Morse, U. S. Atty., E. D. N. Y., L. Kevin Sheridan, Asst. U. S. Atty., Brooklyn, N. Y., of counsel), for appellee.

Before LUMBARD, KAUFMAN and MANSFIELD, Circuit Judges.

MANSFIELD, Circuit Judge:

Theron Clark appeals from a judgment of conviction in the Eastern District of New York, following a jury trial before Judge Mark A. Costantino on two counts of an indictment charging that Clark knowingly and intentionally possessed, with intent to distribute (1) 211 grams of heroin, and (2) 18 grams of cocaine, both in violation of 21 U.S.C. § 841(a)(1) (1972). He was sentenced to two concurrent seven-year terms and an additional special parole term of three years, and is presently incarcerated at the Federal Penitentiary in Petersburg, Virginia. Because Clark and the public were excluded from the entire pretrial suppression hearing held to determine whether the drugs were lawfully seized from him as he was attempting to board an aircraft at LaGuardia Airport, we remand for another suppression hearing. And since the trial judge failed to give adequate and comprehensible instructions to the jury, we reverse the conviction and remand for a new trial.

This case arises in the context of a system of precautions taken by airline authorities and the Federal Aviation Administration to prevent the hijacking of commercial aircraft by identification of potential skyjackers through use of a "profile" screening method. See United States v. Bell, 464 F.2d 667 (2d Cir. 1972); United States v. Lopez, 328 F. Supp. 1077, 1082–1084 (E.D.N.Y.1971).[1] Under the system a passenger who, at the time of his ticket purchase, fits the established profile criteria receives a specially marked ticket or envelope which identifies him as a "selectee." When a "selectee" is designated, the ticket agent alerts other appropriate airline personnel and/or one or more United States Marshals of the impending arrival of the "selectee" at the appropriate boarding gate. At the boarding gate, all passengers are required to pass through a magnetometer which detects the presence of metal objects.

If a "selectee" activates the magnetometer, he is informed of this and asked for his ticket and identification. If he produces satisfactory identification, he will normally be allowed to

[1]. The system has recently been changed. Under new FAA airport security regulations, airport operators are required to provide facilities and procedures "to prevent or deter persons and vehicles from unauthorized access to air operations areas," and must prepare and submit a written master security plan which must be approved by the Administrator, 14 C.F.R. § 107.3 (1973), and then implemented, § 107.7. The plan must now provide for the continuous presence of a law enforcement officer "at the point of, and prior to and throughout, the final passenger screening process prior to boarding, for each flight. . . ." § 107.4. It appears that the passenger screening process presently in use includes a search of the "carry-on" baggage of all passengers who may, in addition to passing through the magnetometer, be asked to disclose objects on their person which have activated it.

board the aircraft, but if he cannot do so he will be "interviewed" by an airline representative or a marshal or both in an attempt to determine the source of the magnetometer's reaction. Failing a satisfactory explanation, the "selectee" will be asked to submit to a patdown of his person and, if necessary, to a search of any articles he may be carrying, in order to determine whether whatever object activated the magnetometer presents a danger to the other passengers and crew members boarding the flight. It does not appear whether he is advised that he has a right to refuse to submit to the search if he decides not to board the plane. Nor is it clear that if he refuses to allow himself or his baggage to be searched, he will simply be turned away without a search and not be allowed to board the plane. If a marshal observes a bulge in his outer clothing which the marshal reasonably suspects may be a weapon, the marshal apparently conducts a protective frisk of the "selectee" anyway.

In the present case, a Deputy United States Marshal, Vincent LaRosa, searched a small handbag carried by appellant as he was proceeding to board a plane bound for Raleigh, North Carolina, and seized from within it the illicit drugs which formed the basis for appellant's prosecution and subsequent conviction. Clark moved to suppress the drugs as the product of an unconstitutional search, and a pretrial hearing was held on the motion.

*The Suppression Hearing*

At the commencement of the suppression hearing appellant was not present. The government made a formal motion, at the instance of the court, that Clark be excluded from the proceedings and that the hearing be conducted *in camera* "to insure that the [hijacker] profile will remain secret in order to deal with potential skyjackers." The motion, to which defense counsel voiced no objection, was granted. Clark and the public were excluded from the *entire* suppression hearing, though appellant was represented throughout the course of the hearing by counsel.

Only two witnesses, Marshal LaRosa and an Eastern Airlines Supervisor, Brian O'Neil, testified at the hearing. Except for a very brief description of the "profile" criteria by Mr. O'Neil, the testimony given in the defendant's absence was wholly concerned with the circumstances leading up to and following the seizure of the drugs. In essence, the witnesses testified that they had been alerted that a passenger on the flight to Raleigh had been designated a "selectee." When Clark appeared at the boarding gate for that flight bearing the distinctively marked boarding pass which identified him as a selectee, O'Neil asked him for it, ascertained that the ticket inside also indicated appellant was a selectee, and verified himself that Clark met the profile criteria. After Clark passed through the magnetometer and activated it, indicating the presence of metal, O'Neil introduced himself and Marshal LaRosa and requested identification. The testimony at the suppression hearing (at which Clark did not testify) indicated without dispute that Clark did not present any identification,[2] and LaRosa consequently asked Clark if he would submit to a patdown, to which appellant reportedly replied, "Go ahead."[3] Finding nothing

2. At trial, however, Clark took the stand and testified that he produced his driver's license when first asked for identification. At the suppression hearing and at trial, Marshal LaRosa testified that the license was not presented until appellant was interviewed in the Marshal's office after the narcotics had been seized. Upon cross-examination at the trial, however, it appeared that LaRosa had told the grand jury that appellant "came up with an expired operator's license" when first asked for identification. He explained the discrepancy by stating the grand jury testimony was incorrect.

3. LaRosa, however, observed at the suppression hearing that when O'Neil asked appellant for identification, appellant "seemed to be in a fog." At trial, he ob-

which would have activated the magnetometer as a result of the frisk, LaRosa told Clark to open the locked bag he was carrying. Clark complied and LaRosa searched the bag looking for weapons. Noticing a bulky object wrapped in a towel, he unwrapped it and uncovered a box which he opened with the thought that it might contain explosives. Instead, the box was found to contain substances which later testing showed to be heroin and cocaine. The handbag also contained a medallion, a tie clip, and a can of shoe polish which would have triggered the magnetometer.

It is readily apparent and not surprising that the suppression hearing covered a wide range of testimony besides the profile criteria in order to determine the validity of the search. At the conclusion of the *in camera* hearing, the district court found that "the method in which defendant was stopped and frisked was reasonable under the circumstances and in accordance with the profile that has been established a reasonable search was conducted and the finding of the contents should not be suppressed." What was surprising and wholly improper was the exclusion of the appellant and the public from the course of an entire pretrial proceeding designed to determine, from evidence of events in which the appellant participated, whether his constitutional right to be free from an unreasonable search and seizure was violated.

In United States v. Bell, 464 F.2d 667 (2d Cir. 1972), we recently upheld the exclusion of a defendant and the public from that limited portion of a suppression hearing restricted to the testimony of Ralph Whitfield, an airlines ticket agent, which concerned a description of the criteria of the "hijacker profile," against the contention that the partial *in camera* procedure employed in that case denied the defendant his right to

confront the witnesses against him, to have the effective assistance of counsel, and to have a public trial. We laid stress, however, on the persuasiveness of the "government's justification for the barring of the public and the defendant, while permitting his counsel to participate," namely, "the compelling urgency of protecting the confidentiality of the profile which has been devised as a method to reduce the threat of hijacking." *Id.* at 669. We found "protection of the air travelling public" to be sufficient "justification for the limited exclusion" of the public. *Id.* at 670. Although the claim that exclusion of the defendant denied him his constitutional right to confrontation was found to be of "substance," it was rejected after a searching analysis of the testimony of the sole witness heard *in camera*, which was restricted to a description of the essential elements of the secret "profile." In particular, we noted that his testimony "bore no relationship at all to the question of Bell's guilt or innocence of the crime charged. He could not identify the defendant and had no independent recollection of the transaction. Whitfield simply testified to the fact that he knew the criteria of the profile (which he delineated), that the ticket to the flight in question was sold by him, that his identifying number was on the ticket which was introduced into evidence, as well as the envelope distinctively marked to indicate to ramp personnel that the passenger was a selectee, that a passenger who purchased a ticket fit the profile, and that no personal exercise of judgment on his part in determining selectees was involved." *Id.* at 671. We specifically observed that "Bell was present and represented by counsel who cross-examined the marshal and the ramp ticket agent who were present at the time of the stop and frisk, which revealed the contraband which led to his

---

served that appellant "appeared to be stupefied. He didn't know if he was going or coming." Appellant testified at trial that he had "shot up . . . some dope" prior to his unsuccessful attempt

to board the flight to Raleigh. He did not testify at the suppression hearing, however, and his physical condition at the time of the search was not explored.

arrest," and ultimately concluded that "the circumstances attending the exclusion [of the defendant], limited as it was, in our opinion did not jeopardize his ability to confront the witnesses testifying as to his guilt and the incidents surrounding his frisk, or hinder the effectiveness of his counsel's assistance." *Id.* at 672.

The case now before us presents a wholly different set of circumstances. The government frankly concedes that "there was testimony adduced from its two witnesses at this *in camera* suppression hearing which did not require the protection from disclosure that their testimony concerning the profile required and, in addition, that had appellant been present in court during the testimony of these witnesses he might conceivably have been able to assist defense counsel in her cross-examination of these witnesses." [4] And indeed there was an abundance of testimony concerning such non-secret matters. The 45-page transcript of the testimony of Marshal La-Rosa and of Eastern Airlines Supervisor O'Neil reveals that O'Neil's testimony regarding the characteristics of the FAA profile was limited to a few sentences and that LaRosa was not questioned at all on the subject. For the most part the testimony of these two witnesses was concerned with the circumstances surrounding Clark's activation of the magnetometer, the interrogation and frisking of him, the search of his bag which led to the discovery of the drugs, and his arrest. This proof bore directly on such questions as whether Clark produced identification before the search of his bag (if he had done so he apparently would have been permitted to board without being searched), and whether he voluntarily and intelligently consented to the search of his bag, in which the narcotics were found.

Without having the benefit of Clark's presence at her elbow to point out potential inaccuracies in the testimony of the two witnesses and to furnish factual information for use in cross-examining them, Clark's counsel was handicapped. Moreover, while we do not know what the record would have revealed if a proper suppression hearing had been held, testimony given later at trial indicated that she may have been unaware of facts that could conceivably have led a court to conclude that the search of Clark's bag was unlawful. At trial, for instance, it was brought out that La-Rosa, who testified that Clark did not identify himself prior to the search of his bag, had testified before the grand jury that prior to the search Clark had produced a driver's license at the loading ramp in response to O'Neil's request for identification. Clark also testified at trial that he had earlier given the ticket agent his driver's license. See notes 2 and 3 *supra*. Furthermore, Clark testified that at the time of his arrest he was 21 years old, he had been an addict since he was 15 or 16 years of age, and he was under the influence of drugs, from which he was beginning to suffer withdrawal.

The government makes a valiant but vain effort to save the hearing by suggesting that references to the operation of the antihijacking program were made throughout the hearing and that the risk of an inadvertent disclosure of the profile criteria in appellant's presence was sufficient to justify the broad exclusion ordered by the trial judge in this case. Moreover, it suggests that even if the wholesale exclusion was error it was harmless because the same testimony was given at trial when appellant was present, and that any error was waived because appellant's counsel indicated prior to her cross-examination of O'Neil at the suppression hearing that it was not "going to be necessary for me to speak to my client."

■ We cannot treat the matter of appellant's constitutional right of confrontation so cavalierly. The exclusion of the defendant permitted in *Bell, supra,* was a carefully limited one. It rep-

4. Appellee's Brief 9.

resented an exception to the general right of a defendant "to be present at a suppression hearing where testimony is to be taken, see 8A J. Moore, Federal Practice ¶ 43.03 [1] (2d ed. 1969); 3 C. Wright, Federal Practice & Procedure § 721 (2d ed. 1968)," United States v. Dalli, 424 F.2d 45, 48 (2d Cir.), cert. denied, 400 U.S. 821, 91 S.Ct. 39, 27 L.Ed. 2d 49 (1960). It was justified solely by the need to protect the secrecy of the hijacker profile which is used to protect the air travelling public. Here any such persuasive justification is lacking, except for the description of the profile criteria, which represented but a minute portion of the hearing testimony. Except for this secret profile criteria, the operation of the hijacking program is a matter of public knowledge. Nor does the remote possibility of an unsolicited, spontaneous disclosure of the elements of the profile justify such a broad policy of exclusion. Since the witnesses were well aware of the government's desire to maintain the secrecy of the profile, the risk of inadvertent disclosure was negligible. Indeed, the same witnesses testified at lengh at trial in the presence of Clark and the public regarding the same circumstances without disclosing the profile. A precautionary instruction by the court to the witnesses would have sufficed. The remote risk of disclosure did not justify exclusion of the defendant and of the public.[5]

■■ The Sixth Amendment's guarantee that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him" has been held so fundamental as to be applicable to the states by the Fourteenth Amendment. Pointer v. Texas, 380 U.S. 400, 406–407, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). The defendant's presence, unless waived by him, United States v. Tortora, 464 F.2d 1202, 1208–1210 (2d Cir. 1972), is

required when a jury is empanelled, see Hopt v. Utah, 110 U.S. 574, 579, 4 S.Ct. 202, 28 L.Ed.2d 262 (1884); Lewis v. United States, 146 U.S. 370, 13 S.Ct. 136, 36 L.Ed. 1011 (1892); United States v. Crutcher, 405 F.2d 239, 242–244 (2d Cir. 1968), cert. denied, 394 U. S. 908, 89 S.Ct. 1018, 22 L.Ed.2d 219 (1969), and when the trial judge gives additional instructions to the jury, Evans v. United States, 284 F.2d 393, 394 (6th Cir. 1960). The Supreme Court has indicated also that in a collateral proceeding under 28 U.S.C. § 2255 "[w]here . . . there are substantial issues of fact as to events in which the prisoner participated, the trial court should require his production for a hearing." United States v. Hayman, 342 U. S. 205, 223, 72 S.Ct. 263, 274, 96 L.Ed. 232 (1952). No less should be required at a pretrial suppression hearing held to determine the constitutionality of a seizure of evidence from an accused, where witnesses are to be questioned, cf. Snyder v. Massachusetts, 291 U.S. 97, 106–107, 54 S.Ct. 330, 78 L.Ed. 674 (1934).

■■ Barring the public from the entire hearing was likewise an error of constitutional magnitude. Without the justification of "protection of the air travelling public," or other compelling reasons, see United States v. Bell, *supra* 464 at 670, there was no reason to deprive the accused of *his* right to a public trial, see Estes v. Texas, 381 U.S. 532, 538–539, 583, 85 S.Ct. 1628, 14 L.Ed.2d 543 (Warren, C. J., concurring), 588 (Harlan, J., concurring) (1965). Cf. United States ex rel. Bennett v. Rundle, 419 F.2d 599, 605–608 (3d Cir. 1969) (exclusion of public from Jackson v. Denno hearing held after a jury was selected and was sent from the courtroom denied right to public trial without need to show prejudice). Moreover, because of the importance of providing an opportunity for the public to observe judicial

---

5. While we took some comfort in *Bell* from the fact that the exclusion there was from the suppression hearing and not from the trial, that was only in the context of a necessary, limited exclusion from testimony of uncontested facts and not, as here, in the context of a total exclusion from all the testimony, some of which might have been controverted, see notes 2 and 3 *supra*, concerning the search and seizure.

proceedings at which the conduct of enforcement officials is questioned, the right to public trial should extend to suppression hearings rather than permit such crucial steps in the criminal process to become associated with secrecy. See United States ex rel. Bennett v. Rundle, *supra* at 606; United States v. Lopez, *supra,* 328 F.Supp. at 1087. In many criminal prosecutions the disposition of the motion to suppress is as important as the trial itself, since granting of the motion may require entry of a judgment of acquittal for lack of other proof sufficient to convict. Certainly that was the case here.

■■ We are wholly unpersuaded by the government's suggestion that appellant's inability to confront the witnesses at the suppression hearing and to assist his counsel in his defense was harmless error. In *Bell* the search of the defendant's person leading to discovery of "hard objects" in his raincoat pockets which could have been gunpowder or explosives used by a hijacker on the plane but turned out to be narcotics was justified because (1) he met the criteria of the hijacker profile, (2) he activated the magnetometer, (3) he had no personal identification, and (4) he volunteered that he "had just been released from the Tombs and that he was out on bail for attempted murder and narcotics charges," 464 F.2d at 669. Absent proof of similar compelling circumstances or that Clark voluntarily and intelligently consented to the search, the opening and examination of Clark's bag would in our view be justifiable only upon a showing that he was aware that he had a right to refuse to be searched if he should choose not to board the aircraft. See United States v. Bell, *supra,* 464 at 675, 676 (concurring opinions of Chief Judge Friendly and Judge Mansfield); United States v. Meulener, 351 F.Supp. 1284 (C.D.Cal.1972); cf. United States v.

Slocum, 464 F.2d 1180 (3d Cir. 1972). Clark was surely entitled to assist his counsel in cross-examining these witnesses and in developing these matters further at the suppression hearing.

Nor is the government helped by the fact that Clark had an opportunity later at trial to confront and cross-examine the witnesses who had testified at the suppression hearing. Manifestly the trial focuses on the issue of guilt or innocence, while the suppression hearing centers upon the validity of the search for and seizure of evidence which the government plans to use later in seeking to prove guilt. The defendant's participation in his defense may take different forms at each stage. Cf. Simmons v. United States, 390 U.S. 377, 389–394, 88 S.Ct. 967, 19 L.Ed. 1247 (1968). Even assuming that the harmless error principle applies to such basic rights, but see United States v. Crutcher, *supra,* 405 F.2d at 244, the possible prejudice to Clark was too great to permit invocation of the principle here. By the time of trial Judge Costantino had already denied Clark's motion to suppress. While the court might conceivably have reversed itself upon development of additional proof, it is most unlikely that Clark would have been permitted to reopen the issue and for that purpose to examine witnesses out of the presence of the jury. Indeed we have only recently directed that such suppression hearings should be concluded prior to trial. United States v. Birrell, 470 F.2d 113 (2d Cir. 1972).

■ Equally unconvincing is the suggestion that appellant waived his Sixth Amendment rights when his counsel told the district judge that it would not be necessary for her to speak to her client prior to her cross-examination of O'Neil. Even if counsel intended to waive appellant's presence at the hearing, which we doubt, by making that statement and failing to object to his exclusion,[6] appel-

---

6. Under the circumstances an objection may have appeared to her to be futile, as would effective consultation with her client in the midst of the hearing, cf.

United States ex rel. Negron v. New York, 310 F.Supp. 1304, 1307 (E.D.N.Y.), aff'd, 434 F.2d 386 (2d Cir. 1970).

lant's silence *in absentia* could certainly not be said to have amounted to "an intentional relinquishment or abandonment of a known right," Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938), by him. See United States v. Crutcher, *supra*, 405 F.2d at 243; Evans v. United States, *supra*, 284 F.2d at 395.

Under the circumstances the exclusion of the defendant and of the public from that portion of the suppression hearing which did not deal directly with the characteristics of the secret antihijacking "profile" constituted plain error. Rule 52(b), F.R.Cr.P.

### The Trial Judge's Instructions to the Jury

█ We turn to the trial judge's instructions regarding the legal principles which the jury was required to apply in determining whether Clark should be convicted or acquitted of the two charges against him. If justice is to be done in accordance with the rule of law, it is of paramount importance that the court's instructions be clear, accurate, complete and comprehensible, particularly with respect to the essential elements of the alleged crime that must be proved by the government beyond a reasonable doubt, see Holland v. United States, 348 U.S. 121, 138, 75 S.Ct. 127, 99 L.Ed. 150 (1954); United States v. Lodwick, 410 F.2d 1202, 1204 (8th Cir. 1969). Unfortunately in this case the judge, in what appears to have been an extemporaneous charge, not only failed clearly to identi-

fy and accurately define the elements of the offense, but he also gave the jurors improper and misleading instructions concerning the use of circumstantial evidence, the drawing of inferences, and the method by which the jurors might judge the credibility of witnesses.

The indictment contains two counts, each of which charged appellant with a violation of 21 U.S.C. § 841(a)(1) (1972) [7] based on his alleged knowing and intentional possession of narcotic drug controlled substances (Count I, heroin; Count II, cocaine) with the intent to distribute them.

█ At the beginning of his charge, and long before he read or described the contents of the indictment and relevant statutes, the trial judge launched into an abortive and confusing description of the two elements of each alleged offense.[8] "Knowledge" and "intent" were differentiated at first and then confusingly lumped together without explanation and without any attempt to define in a meaningful manner what must be proved to establish the two distinct and crucial elements of each alleged offense. Although the court referred to the necessity of proving "specific intent," that term, which presumably referred to the intent to distribute the narcotics, was never defined, though it was later stated to be an essential element of the alleged crime. Absent clarification this would have required a new trial, since the effect was almost surely to confuse or to leave an erroneous impression in the minds of the jury. See

---

7. That section provides:
   "§ 841. *Prohibited acts A—Unlawful acts*
   "(a) Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—
   (1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance; . . . . . "

8. "And each count, of course, in order to convict this defendant, and I'll give you the rule of reasonable doubt a little later on in my charge.

"Each count must be proven to your satisfaction to the principle beyond a reasonable doubt and involves two elements: One is a question of knowledge and the second a question of intent, and I'll tell you first what knowingly to do an act means or have a knowledge of it, or what intent means.

"An act is done knowingly, done voluntarily and intentionally, not because of mistake or extent or other reasons. As I've said to you, the specific intent in this case must be proven beyond a reasonable doubt, otherwise it cannot be a conviction."

United States v. Gillilan, 288 F.2d 796, 797 (2d Cir. 1961) (L. Hand, J.) ("certainly the statute requires some definition of the meaning of the words which may not be left to the jury"); cf. United States v. Byrd, 352 F.2d 570, 572–574 (2d Cir. 1965). There followed a discussion by the court of a series of matters unrelated to the essential elements of the crimes charged, some of which, according to the record before us, is incomprehensible. After alluding to the "two elements" of the offenses[9] the court read the counts of the indictment and pertinent statutes to the jury, following which it again referred to the elements.[10] However, the key terms remained undefined. Viewed from the standpoint of fairness to the accused there is a strong probability that the court's references to the alleged offenses "taken as a whole [were] such as to confuse or leave an erroneous impression in the minds of the jurors," Perez v. United States, 297 F.2d 12, 16 (5th Cir. 1961). Under the circumstances we cannot ascertain and should not speculate as to the basis upon which the jury reached its conclusion of guilt. See Smith v. United States, 230 F.2d 935, 939 (6th Cir. 1956); Patterson v. United States, 183 F.2d 687, 690 (5th Cir. 1950).

■ The government's effort to minimize the effect of the error by suggesting that the defendant's entire defense was "lack of knowledge of the contents of the suitcase,"[11] is insufficient to shoulder its appointed burden. Whatever defense appellant chose to stress for his part, the government retained the burden of proof beyond a reasonable doubt of each element of the offense, including intent to distribute narcotics. Moreover, that burden had to be met on the basis of proper instructions.

■ Further errors appear in other portions of the court's charge. Circumstantial evidence was vaguely defined as evidence that *"would indicate"* proof of such essential elements as guilty knowledge and intent.[12] Despite references elsewhere in the charge to the government's burden of establishing guilt ac-

9. "To constitute the crime charged in the indictment, there must be the joint operation of two essential elements; an act forbidden by law and an act in an attempt to do that act.

"Before a defendant may be found guilty of a crime, the prosecution must establish beyond a reasonable doubt that under the statute described in which I'll read to you a little later on in these instructions, defendant was forbidden to do the act number one, and the charge in the indictment, and number two, that he's intentionally admitted the act as stated before."

10. "[A]nd if you notice, I gave you the definition of knowingly and intentionally and you must now find, if you are going to convict this defendant under that section, you must find those two elements that I have described to you, knowingly and intentionally, was going to violate this law that I have read to you, including the next section, 841 (a)1 which reads as follows: . . . .

\* \* \* \* \*

"As I've said to you, both of these sections require two elements to be proven by the Government in this case;

one is that the act of knowingly, intentionally possessing a controlled substance and the second, the intent to distribute it, and I've told you what they were, and these two items and these two essential elements must be proven by the Government by the principle of a reasonable doubt as to each essential element."

11. Appellee's Brief 12.

12. "Now, circumstantial evidence is that evidence is not directly proven to you. For instance, direct evidence would be like the suitcase, and the items of the suitcase, that's direct evidence, that's something they have knowledge of and you can see circumstantial evidence is that evidence that surrounds, and because of the inability to have evidence that would tend to be relative to it, it comes in circumstantially.

"You may consider both types of evidence; circumstantial evidence would be, for instance, whether or not all of the evidence taken together would indicate whether or not this defendant had knowledge or intent or both to commit this crime to which he's been charged."

cording to the reasonable doubt standard, the jury was not entitled to infer proof of guilty knowledge and intent merely on the basis that circumstantial evidence *"would indicate"* such crucial elements. See United States v. Fields, 466 F.2d 119, 120 (2d Cir., 1972). Since there was no direct evidence that appellant knew that the contents of the handbag included the narcotics, and he in fact testified that he did not, it was especially important that the jury be properly instructed on how to evaluate circumstantial evidence. The court's instruction on the subject cannot, therefore, be treated as harmless error.

■ The trial judge's instruction on inferences not only failed to define what an inference is, see, e. g., Mathes, Jury Instructions and Forms for Federal Criminal Cases, 27 F.R.D. 39, 51 (1960) ("An inference is a deduction or conclusion which reason and common sense lead the jury to draw from facts which have been proved"), but it improperly barred the jury from drawing more than a single inference from a material fact.[13] Finally, the judge, possibly through inadvertence, authorized the jurors to disregard or reject testimony of a witness on the basis of their personal dislike of him.[14] A juror, although disliking a witness, may still believe his testimony. The danger of improper bias entering a juror's evaluation of credibility as a result of the instruction was substantial here, since the appellant took the stand in his own defense.

■ We must regretfully conclude that, despite the surprising absence of objection by appellant's counsel, the trial judge's charge, viewed as a whole, is so deficient and defective in material respects as to amount to "plain error . . . affecting substantial rights" within the meaning of Rule 52(b), F.R. Cr.P., United States v. Fields, *supra.* The error is one that we feel bound to consider on appeal not only to assure appellant of a fair trial but to protect the integrity of our administration of the criminal justice system, see United States v. Vaughan, 443 F.2d 92, 94–95 (2d Cir. 1971); Screws v. United States, 325 U.S. 91, 107, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945).

We recognize that the task of delivering an accurate and truely instructive charge to a jury is a demanding one. Of foremost importance is the necessity for organizing and outlining governing legal principles in a logical sequence that will fairly inform the jurors of the essential rules to be applied by them in reaching their verdict. Certain principles, of course, are of such a standard and recurring nature that they should present no serious problem for the court in the average case. Others require more preparation and thought on the judge's part. Complex legalisms must be translated into simple prose that will be understandable by the average layman. The essential elements of the alleged crime or crimes and of any defenses raised by the defendant should be clearly described. Terms of legal significance should be defined in a way that will be understood. If illustrations are to be given, and they are often instruc-

---

13. "At this point, the Court would like to tell you you can also draw inferences from a material fact in the case.
"Now, a material fact in the case would be the bag, and the contents of that bag. You may draw an inference from that material fact, but only one inference that you may draw.
"To give you an example, if I had a glass of water on my bench and I tip it over, you can drawn an inference the water will fall to the floor. If I tip over the same glass of water, you cannot draw an inference that it will be caught in another glass on the floor, so you can only draw one inference in a material fact in a case. Any material fact in a case and any fact that you think you can deduce and draw an inference."

14. "Sometimes one statement from the person, you look at the person and they said something to you, and you may have been with your friends. *Somehow or other you don't either like that person* or you don't believe what they told you. That's your good common sense working." (Emphasis supplied)

tive, they should be furnished in addition to, not in substitution for, plain explanations of those criteria that are to govern the jury's deliberations. In a factually complicated or protracted case, where the jury may have difficulty recalling the evidence, the judge may find it advisable to marshal the parties' contentions and proof. A nice balance must be struck between brevity and verbosity. A clear delivery in a tone that will command and retain the jury's attention can be of considerable aid to the jury in understanding the legal principles by which it is to be governed.

A few gifted jurists, aided by extensive experience on the bench, are capable of extemporaneously delivering instructions to the jury which meet these demanding standards, at least in cases where the issues are relatively simple or recurring and the governing principles well established. But most trial judges, particularly those of limited experience, find it advisable to prepare in advance at least a rough written outline, if not a fully developed text, of the instructions to be given to the jury. Although additional time and effort is required in this process, it insures a logical and orderly organization and the avoidance of error. We are persuaded that if that procedure had been followed in the present case most if not all of the errors could have been avoided.

The Supreme Court observed in Bollenbach v. United States, 326 U.S. 607, 612, 66 S.Ct. 402, 405, 90 L.Ed. 350 (1946), a case considerably more complex than the case here, that "[d]ischarge of the jury's responsibility for drawing appropriate conclusions from the testimony depended on discharge of the judge's responsibility to give the jury the required guidance by a lucid statement of the relevant legal cri-

teria." Cf. United States v. Persico, 349 F.2d 6 (2d Cir. 1965). We are compelled to conclude in the present case that the guidance given the jury did not approach that standard required to enable it to fulfill its function properly, and that consequently a new trial must be had.[15] In view of the trial judge's past ruling and decision with respect to the suppression issues, a hearing before another member of the court is advisable.

Reversed and remanded.

---

15. Because the conviction is reversed, we need not consider appellant's contention that errors were committed in the sentencing proceeding. We do note, however, that a district judge is obligated to exercise his discretion as to treatment or imprisonment under the Narcotics Addict Rehabilitation Act, 18 U.S.C. § 4251 et seq., for eligible defendants. United States v. Williams, 407 F.2d 940 (4th Cir. 1969); United States v. Phillips, 403 F.2d 963 (6th Cir. 1968). See also United States v. Hollis, 450 F.2d 1207, 1209 (5th Cir. 1971).