UNITED STATES of America

v.

Henry J. CIANFRANI (two cases).

Appeal of Intervenors, PHILADELPHIA NEWSPAPER, INC., Jan Schaffer and James Smith, in No. 77–2445.

Appeal of BULLETIN COMPANY and Columbia Broadcasting System, in No. 77–2462.

Nos. 77–2445, 77–2462.

United States Court of Appeals, Third Circuit.

Argued Dec. 20, 1977.

Decided March 16, 1978.

Donald L. Weinberg, Samuel E. Klein, David H. Weinstein, Kohn, Savett, Marion & Graf, Philadelphia, Pa., for appellants in No. 77–2445.

John R. McConnell, Joseph H. Huston, Jr., Morgan, Lewis & Bockius, Philadelphia, Pa., for appellants in No. 77–2462.

Nicholas J. Nastasi, Sanford I. Jablon, Philadelphia, Pa., for appellee, Henry J. Cianfrani.

Before SEITZ, Chief Judge, and GIBBONS and GARTH, Circuit Judges.

## OPINION OF THE COURT

SEITZ, Chief Judge.

Several newsgathering organizations and two individual reporters ("intervenors") appeal an order of the district court excluding the public from a pretrial suppression hearing and sealing the record of that hearing.[1]

### I.

### FACTUAL BACKGROUND.

On September 23, 1977, a federal grand jury indicted Henry J. Cianfrani ("defendant") for crimes arising out of his alleged misuse of public office. At the time of the

---

1. Intervenors are Philadelphia Newspapers, Inc., (consisting of the *Philadelphia Inquirer* and the *Philadelphia Daily News*); two individual reporters, Jan Schaffer and James Smith; the Bulletin Co.; and the Columbia Broadcasting System. The order at issue was entered in a criminal case, *United States v. Cianfrani*, Crim. No. 77–412 (E.D.Pa. Nov. 16, 1977).

indictment, defendant was a powerful and prominent politician in Philadelphia. A former member of the state house of representatives, he had served for the past eleven years as a member of the state senate and at the time of his indictment was chairman of the senate appropriations committee.

The defendant was indicted on 110 counts charging four substantive crimes. The bulk of the counts charged him with mail fraud, 18 U.S.C. § 1341, and racketeering, 18 U.S.C. §§ 1961, 1962(c), 1963, in connection with two illegal schemes related to his official positions. The indictment alleged that in one scheme the defendant had placed friends on the payroll of the state legislature with the understanding that those friends would not be required to perform any work. The second alleged scheme charged the defendant with accepting bribes in return for exerting his influence with state-funded graduate and professional schools in order to obtain the admission of certain individuals to those schools.

The grand jury also charged the defendant with income tax evasion in violation of 26 U.S.C. § 7201, and with obstruction of justice in violation of 18 U.S.C. § 1503.

Defendant pleaded not guilty to all the charges when he was arraigned. The district court then set a trial date and established a timetable for the filing of pretrial motions and briefs. The court fixed November 15, 1977, for argument of any pretrial matters.

The government thereafter filed a Motion for the Use of Tape Recordings and Transcripts of Consensually Monitored Conversations. It brought this motion in an attempt to comply with this court's decision in *United States v. Starks*, 515 F.2d 112 (3d Cir. 1975), which requires that a party intending to offer recordings into evidence at trial " 'produce clear and convincing evidence of authenticity and accuracy as a foundation for the admission of such recordings.' " *Id.* at 121, *quoting United States v. Knohl*, 379 F.2d 427, 440 (2d Cir.), *cert. denied*, 389 U.S. 973, 88 S.Ct. 472, 19 L.Ed.2d 465 (1967). The court in *Starks*

recommended that the party offering the recordings specifically be required to prove, as part of the required foundation, that the intercepted conversations were " 'made voluntarily and in good faith, without any kind of inducement.' " *United States v. Starks*, 515 F.2d 112, 121 n.11 (3d Cir. 1975), *quoting United States v. McKeever*, 169 F.Supp. 426, 430 (S.D.N.Y.1958).

The government's motion alleged that one Vera Domenico, a former girlfriend of the defendant, and one Philip Gagliardi, had agreed to allow the government to record conversations they had with the defendant, or with third persons about the defendant. The government sought to authenticate recordings of seven such conversations. Three were of face-to-face conversations, picked up by recorders activated by Domenico or Gagliardi. The remaining four recordings were of telephone conversations recorded by a device attached to Domenico's telephone.

The government stated that each of the seven recordings satisfied all of the requirements set forth in *United States v. Starks, supra.* It added, apparently by way of emphasis, that all of the recordings had been made with the consent of one of the parties involved.

The defendant answered that he was without sufficient information to agree with the government's allegations that the recordings could satisfy the *Starks* tests or that the recordings had been obtained with the valid consent of at least one party involved. The defendant accordingly requested the court to put the government to its proof on the issues raised in the *Starks* motion. The defendant's answer also moved to suppress the recordings on the ground that the tapes revealed entrapment as a matter of law.

The defendant also filed a Supplemental Motion to Dismiss in the Nature of a Motion to Suppress. Insofar as that motion concerned the tapes that were the subject of the government's *Starks* motion, it alleged that the tapes had been obtained through coercion. The motion also alleged that the tapes violated the speech or debate

clause of the Constitution in that they revealed information privileged under that clause.

Even before the filing of these motions and answers, the defendant by letter to the court had requested that any proceedings concerning the intercepted communications at issue in the case be held *in camera* and that the resultant record be sealed. In addition, one of the individual reporters involved in this appeal asked that the court hear her through counsel before deciding to close any proceedings to the press.

Accordingly, on November 14, 1977, the court notified those representatives of the press who happened to be in the courthouse in Philadelphia at the time that the defendant had moved to close the November 15, 1977, hearing and that the court would consider motions from the press to intervene for the purpose of opposing defendant's motion. Intervenors filed such motions that same day. The court granted leave to intervene and intervenors participated fully in argument held the next day on defendant's motion to close the suppression hearing.[2]

The district court ruled on defendant's motion from the bench on November 16, 1977, supplementing that bench opinion with a written Memorandum on November 21, 1977. The court found that the first amendment required a presumption of access to all court proceedings, including the pretrial suppression hearing at issue in this case. The court went on to say that the defendant had not made the showing to overcome that presumption that the district court believed to be required by *Nebraska Press Association v. Stuart,* 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976): though the court conceded that there was a substantial likelihood that prejudicial information would reach potential jurors if the hearing were not closed, it could not say that such prejudice could not be overcome by alternatives to closure such as voir dire, change of venue, continuance, severance, peremptory challenge, and sequestration and admonition of the jury.

The district court went on to find, however, that Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510 *et seq.,* the federal wiretapping statute, required the court to close the proceeding and to seal the resultant record. Relying on the strong congressional intent to protect the privacy of communications that it believed underlay the Act, as well as on the Act's specific provisions, the court held that Title III created a broad "privilege" against public disclosure of intercepted communications except at the full trial on the issue of the guilt or innocence of the defendant, and then only if there had been a previous determination that the communications had been lawfully intercepted.

Intervenors immediately appealed to this court. We granted an expedited appeal, though we refused summarily to reverse the order of the district court or to stay either the order or the hearing itself pending appeal. *United States v. Cianfrani,* Nos. 77–2445, 77–2462 (3d Cir., November 23, 1977). The district court proceeded with the *Starks* and suppression hearing with all members of the public excluded.

At this *in camera* proceeding, the government introduced first the testimony of two agents of the Federal Bureau of Investigation. They testified to the circumstances under which Vera Domenico gave them her consent to record some of the conversations at issue. They also told of the manner in which the recordings were made. Domenico herself then took the stand and testified about her agreement to cooperate with the government and the manner in which she assisted in making the tapes.

During Domenico's testimony the government sought to introduce into evidence the tape and accompanying transcript of one of the telephone conversations between Domenico and the defendant's associate, one Frank Gerace, recorded on June 9, 1977. The defendant attempted to forestall the playing of the tape by offering to stipulate

**2.** The government took no part in the argument below, and expressed no position, either in this court or in the district court, on the merits of defendant's motion.

that the tapes met all of the *Starks* requirements except that concerning consent, and then by arguing that it was not necessary to introduce into the record any portion of the tapes or transcripts in order to determine the issue of consent.

The court ruled that the government could not be prevented from introducing the tapes if the government believed it necessary to do so in order to meet its *Starks* burden or rebut the suppression motion of the defendant. The recording of the June 9, 1977, tape was then played, and the transcript of that same conversation was introduced into evidence. At that point, the defendant stipulated that the recordings had been made with the consent of one of the parties involved, and that the tapes thus met all the requirements of *Starks*. The defendant also withdrew his motion to suppress insofar as it alleged coercion in the obtaining of consent. The stipulation extended to all the tapes and transcripts that the government listed in its *Starks* motion, even though only the tape of the June 9, 1977, conversation was made part of the record of the hearing. The court then granted the government's *Starks* motion. The court also denied that part of the defendant's suppression motion alleging a violation of the speech or debate clause.

The district court then ordered the record of the secret proceeding to be sealed and impounded. On November 29, 1977, it issued a brief public memorandum and order outlining the events of the secret suppression hearing. The order granted the government's *Starks* motion and made it clear that the defendant had withdrawn his other allegations that the tapes had been obtained by coercion.

This court heard argument on intervenors' appeals on December 20, 1977. On December 30, 1977, the defendant pleaded guilty to all the counts except those charging income tax evasion, to which he pleaded nolo contendere. After the court questioned the defendant about the plea, the government read into the public record an extensive summary of the evidence it had intended to present at trial against the defendant. That reading included portions of the transcripts of the intercepted communications at issue in the *in camera* suppression hearing. The government also put into the record a lengthy appendix of documents it had intended to introduce at the trial, including the transcripts of all the recordings mentioned in the *Starks* motion.

During the plea hearing, the government thus placed on the public record the contents of all the tapes that the defendant sought to keep from public disclosure at the November 28 suppression hearing, including the June 9, 1977, transcript that was part of the record made at that suppression hearing. Consequently, part of the information contained in the sealed record of the suppression proceeding has been made public, though the majority of that record has not yet been revealed.

The district judge accepted the plea as tendered. On February 15, 1978, the court sentenced the defendant to five years in prison on the racketeering count, that sentence to run concurrently with a sentence of five years in prison on the mail fraud counts. The court suspended sentence on the obstruction of justice and tax evasion counts, but did impose concurrent terms of five years' probation for those crimes. The probation terms are consecutive to the prison terms.

## II.

## JURISDICTION, STANDING, and MOOTNESS.

This appeal presents three threshold questions: whether we have jurisdiction; whether the intervenor-appellants have the requisite standing; and whether this appeal is moot because of the termination of the underlying prosecution.

### A.

Intervenors assert that this court has jurisdiction over their appeal under 28 U.S.C. § 1291. That provision gives to the "courts of appeals . . . jurisdiction of appeals from all final decisions of the district courts of the United States." 28 U.S.C. § 1291.

■ We believe that the district court order closing the pretrial suppression hearing and sealing the record was a "final decision" as to intervenors, and thus appealable to this court within the "collateral order" doctrine of *Cohen v. Beneficial Industrial Loan Corp.,* 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). "The order in the instant case constituted a final decision since it determined a matter independent of the issues to be resolved in the criminal proceeding itself, bound persons who were non-parties in the underlying criminal proceeding and had a substantial, continuing effect on important rights." *United States v. Schiavo,* 504 F.2d 1, 4 (3d Cir.) (in banc) (footnote omitted), *cert. denied,* 419 U.S. 1096, 95 S.Ct. 690, 42 L.Ed.2d 688 (1974).

B.

Intervenors believe they are proper parties to challenge the district court's order. Though the defendant has not raised the issue of standing in this court, he did question whether intervenors had such standing at the time the district court first made known its willingness to entertain motions to intervene. Whether defendant pressed the issue below, or whether the district court ever explicitly ruled on it, does not appear in the record.

In any event, we are obliged to consider whether the intervenors have standing. We conclude that they do.

■ Intervenors' allegations that the district court denied them access to the pretrial hearing, and continues to deny them access to the record of that proceeding, state the constitutionally required " 'injury in fact,' that is, a sufficiently concrete interest in the outcome of their suit to make it a case or controversy subject to a federal court's Art. III jurisdiction." *Singleton v. Wulff,* 428 U.S. 106, 112, 96 S.Ct. 2868, 2873, 49 L.Ed.2d 826 (1976).

■ The intervenors claim that the order of the district court barred them from attending the hearing, and prevents them from reading the record. They seek the aid of this court to remove the continuing effect of the district court's action, as well as to establish the illegality of such closure orders for the future. Such "specific, concrete facts demonstrat[e] that the challenged practices harm [intervenors], and that [intervenors] personally would benefit in a tangible way from the court's intervention." *Warth v. Seldin,* 422 U.S. 490, 508, 95 S.Ct. 2197, 2210, 45 L.Ed.2d 343 (1975) (footnote omitted). *Accord, Central South Carolina Chapter, Society of Professional Journalists, Sigma Delta Chi v. Martin,* 556 F.2d 706, 707–08 (4th Cir. 1977), *cert. denied,* —— U.S. ——, 98 S.Ct. 749, 54 L.Ed.2d 771 (1978) (No. 77–263).

■ We also believe intervenors to be "proper proponents of the particular legal rights on which they base their suit." *Singleton v. Wulff,* 428 U.S. 106, 112, 96 S.Ct. 2868, 2873, 49 L.Ed.2d 826 (1976). They allege that the exclusion of the public by the district court was a violation of the public's and the press's first and sixth amendment rights both to have access to court proceedings and to receive and gather information about government activities. Intervenors' claims thus are "arguably within the zone of interests intended to be protected by the constitutional . . . provision on which" they rely. *Id.* at 123 n. 2, 96 S.Ct. at 2878 (Powell, J., concurring in part and dissenting in part). *Accord, United States v. Gurney,* 558 F.2d 1202, 1206 (5th Cir. 1977). Intervenors thus satisfy those prudential standing requirements, beyond the "injury in fact" requirements of Art. III.

■ Nor do intervenors lack standing because they assert rights that may belong to a broad portion of the public at large. So long as the "injury in fact" alleged by each intervenor is "a distinct and palpable injury to himself," standing should not be denied "even if it is an injury shared by a large class of other possible litigants." *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975). *E. g., United States v. Students Challenging Regulatory Agency Procedures (SCRAP),* 412 U.S. 669, 683–90, 93 S.Ct. 2405, 37 L.Ed.2d

254 (1973). We believe that intervenors have alleged injuries beyond generalized grievances, and that they state sufficiently such demonstrable, particularized injury to justify the assertion of jurisdiction by this court.

### C.

Ten days after the parties argued this appeal, the defendant pleaded either guilty or nolo contendere to all the charges against him, thus terminating the underlying criminal proceeding. He was sentenced on February 15, 1978. No further proceedings remain below. Moreover, at the guilty plea hearing the government made public a part of the information contained in the sealed record of the November 28 hearing.

The transcript of the *Starks* and suppression hearing remains sealed, however. It will remain so indefinitely by the terms of the court's order, since there will be no trial below. The information released by the government at the plea hearing was only a small portion of what is contained on the sealed record. The testimony of the two FBI agents and of Domenico on the issue of Domenico's consent to the interceptions, the colloquies between counsel and court, and the remarks and specific rulings of the presiding judge remain hidden from public view.

Under these circumstances, we believe the intervenors present us with a live controversy concerning the release of the sealed record. Should we reverse the order of the district court, our decision will have the immediate effect of requiring the court to open the record to the public. Should we affirm, we would continue the present effect of the order in force.

Insofar as the intervenors seek reversal of the original decision to close the hearing, we believe they present us with a controversy capable of repetition, yet evading review. *Nebraska Press Association v. Stuart,* 427 U.S. 539, 546–47, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976).

In this case, we declined to grant the extraordinary remedies of summary reversal or a stay pending appeal. To have granted a stay of the order would have been the equivalent of a summary reversal, since it would have had the effect of requiring the hearing to be held in public. And we believed summary reversal to be unwise in light of the difficult and important questions involved, as well as in light of the severe and irreversible impact of a public hearing on defendant's rights. We also declined to stay the hearing itself out of concern that such action might have jeopardized the prosecution by possibly delaying the start of trial beyond the date mandated by the Speedy Trial Act, 18 U.S.C. § 3161, *et seq.*

■ Absent such extraordinary relief, review of a closure order similar to that issued in this case generally must come after the pretrial hearing is over, and often must come after the underlying criminal proceeding is over as well. To deny review because those underlying proceedings have come to an end would make it difficult for this court ever to review orders that are of great importance to fundamental rights, yet that are by their nature often of short duration. Thus, we believe that the order of the court closing the hearing and sealing the record is one capable of repetition in other cases, yet one that evades review in the specific instance.

We conclude that this portion of the case is not moot, *United States v. Schiavo,* 504 F.2d 1, 5 (3d Cir.) (in banc), *cert. denied,* 419 U.S. 1096, 95 S.Ct. 690, 42 L.Ed.2d 688 (1974), and proceed to the merits of the dispute.

### III.

### ACCESS to the PRETRIAL SUPPRESSION and *STARKS* HEARING.

The first question we must face concerns the nature and extent of the right of the public to have access to the pretrial suppression and *Starks* hearing held in this case.

## A.

■ We begin our analysis by emphasizing that our law strongly favors the presumption that all adjudicative proceedings are open to the public. This presumption is rooted deeply in our common law heritage and it is part of two provisions of the Constitution: the due process clause of the fifth amendment, and the "public trial" provision of the sixth amendment.

The strongest expression of this policy in the federal constitution is, of course, the sixth amendment: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial . . . ." *U. S. Const.*, amend. VI.[3]

■ The sixth amendment reflects "[t]he traditional Anglo-American distrust for secret trials" and is an expression of our belief that the "knowledge that every criminal trial is subject to contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of judicial power." *In re Oliver,* 333 U.S. 257, 268, 270, 68 S.Ct. 499, 505, 92 L.Ed. 682 (1948) (footnote omitted). The Court in *Oliver* noted that publicity allowed key witnesses unknown to the parties to come forward and give important testimony, and provided a way for spectators to learn about their government and acquire confidence in judicial remedies. *Id.* at 270 n. 24, 68 S.Ct. 499. The Court went on to quote Jeremy Bentham on the strong common law belief in open trials that underlies the sixth amendment: " 'Without publicity, all other checks are insufficient: in comparison of publicity, all other checks are of small account. Recordation, appeal, whatever other institutions might present themselves in the character of checks, would be found to operate rather as cloaks than checks; as cloaks in reality, as checks only in appearance.' " *Id.*

at 271, 68 S.Ct. at 506, *quoting* 1 *J. Bentham, Rationale of Judicial Evidence* 524 (London, 1827).

■ Even when the Court has found it necessary to approve some limitations on courtroom publicity, it has been careful to reaffirm its belief in the "principle that justice cannot survive behind walls of silence." *Sheppard v. Maxwell,* 384 U.S. 333, 349, 86 S.Ct. 1507, 1515, 16 L.Ed.2d 600 (1966). In speaking of the role of the press in reporting on judicial proceedings, the *Sheppard* Court emphasized the important function of the open trial in our system:

> A responsible press has always been regarded as the handmaiden of effective judicial administration, especially in the criminal field. Its function in this regard is documented by an impressive record of service over several centuries. The press does not simply publish information about trials but guards against the miscarriage of justice by subjecting the police, prosecutors, and judicial processes to extensive public scrutiny and criticism.

*Id.* at 350, 86 S.Ct. at 1515. *Accord, Estes v. Texas,* 381 U.S. 532, 538–544; 583, 85 S.Ct. 1628, 14 L.Ed.2d 543 (Warren, C. J., concurring) (1965).

The sixth amendment's public trial provision is derived from the strong common law policy in favor of public proceedings. *In re Oliver,* 333 U.S. 257, 268–271, 68 S.Ct. 499, 92 L.Ed. 682 (1948). Indeed, the practice of holding court proceedings in the open was an ancient one at common law. By Blackstone's time, the rule that all judicial proceedings were presumed to be open to the public long had been well-established as a check on judicial power and a deterrent to perjury by witnesses. In describing trial procedures, Blackstone noted that "all . . . evidence is to be given in open

---

3. The Supreme Court has also held that the due process clause of the fifth amendment "demands appropriate regard for the requirements of a public proceeding in . . . all adjudications through the exercise of the judicial power." *Levine v. United States,* 362 U.S. 610, 616, 80 S.Ct. 1038, 1042, 4 L.Ed.2d 989 (1960). *See Craig v. Harney,* 331 U.S. 367, 67 S.Ct. 1249, 91 L.Ed. 1546 (1947).

In this regard, we note that Rule 26 of the Federal Rules of Criminal Procedure requires that "[i]n all trials the testimony of witnesses shall be taken orally in open court, unless otherwise provided by an Act of Congress or by [other] rules." *Fed.R.Crim.P.* 26.

court," and that rulings of the judge were to be "publicly allowed or disallowed, in the face of the country; which must curb any secret bias or partiality that might arise in his own breast." 3. *W. Blackstone, Commentaries* \*372. Blackstone also believed publicity served to discourage perjury, since "a witness may frequently depose that in private which he will be ashamed to testify in a public and solemn tribunal." *Id.* at \*373.

Wigmore agreed with Blackstone that publicity discouraged witnesses from perjury by inducing in them the fear of exposure while at the same time "stimulating the instinctive responsibility to public opinion." 6 *J. Wigmore, Evidence in Trials at Common Law* § 1834 at 435 (Chadbourne rev. 1976). Moreover, he believed that persons who otherwise might not know that they possessed information relevant to the trial, or who could rebut false testimony given in open court, were given an opportunity to observe the proceedings and make themselves known to the court.

Wigmore also noted that public proceedings served a vital societal function in that they moved the court, the parties, and the witnesses "more strongly . . . to a strict conscientiousness in the performance of duty." *Id.* at 438. And, according to Wigmore, public proceedings were an important way to educate the public about the processes of government and to instill confidence in the judgments of the courts:

> Not only is respect for the law increased and intelligent acquaintence acquired with the methods of government, but a strong confidence in judicial remedies is secured which could never be inspired by a system of secrecy.

*Id.* (footnote omitted). See 1 *J. Bentham, Rationale of Judicial Evidence* 522–537 (London, 1827).

■ The courts of this circuit long ago recognized the principle that the "[c]ourts of justice must be open." *United States v. Buck,* 24 Fed. Cases 1289, 1293 (No. 14,680) (E.D.Pa.1860). Indeed, in the belief that the sixth amendment "provision is a reflection of the notion, deeply rooted in the common law that 'justice must satisfy the

appearance of justice,'" *Levine v. United States,* 362 U.S. 610, 616, 80 S.Ct. 1038, 1042, 4 L.Ed.2d 989 (1960), *quoting Offutt v. United States,* 348 U.S. 11, 14, 75 S.Ct. 11, 99 L.Ed. 11 (1954), we have not required a showing of prejudice by a defendant to support a reversal premised on an infringement of the sixth amendment public trial right. *E. g., United States v. Kobli,* 172 F.2d 919, 921, 923–24 (3d Cir. 1949) (in banc). Our cases have recognized that

> [t]he searchlight of a trial which is open to the public serves as a restraint against the abuse of judicial power and also against possible perjury by witnesses who know that their testimony is exposed to public knowledge.

*Bennett v. Rundle,* 419 F.2d 599, 606 (3d Cir. 1969) (in banc) (footnote omitted).

■ This strong sixth amendment requirement of a public trial in criminal cases emphasizes that publicity is "of critical importance to our type of government in which the citizenry is the final judge of the proper conduct of public business." *Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469, 495, 95 S.Ct. 1029, 1046, 43 L.Ed.2d 328 (1975). Every criminal prosecution raises important questions not only about the activities of the accused, but also about the conduct of the police, the prosecution, and the court in the carrying out of public business. And where the prosecution is of a powerful politician for abuse of his public office, the already strong public interest in observing the proceedings is enhanced.

### B.

■ We thus proceed from the basic presumption that adjudicative proceedings in our courts, especially those in criminal cases, ought to be open to the public. But the sixth amendment itself guarantees only an open "trial." Whether "trial" includes the pretrial *Starks* and suppression hearing held in this case has not been decided by either this court or the Supreme Court. Indeed, the question has been considered by few other courts, and with conflicting results. *See Nebraska Press Association v. Stuart,* 427 U.S. 539, 564 n.8; 584 n.11, 96

S.Ct. 2791, 49 L.Ed.2d 683 (Brennan, J., concurring) (1976).

This court has considered the application of the sixth amendment's public trial guarantee to an analogous proceeding in *Bennett v. Rundle*, 419 F.2d 599 (3d Cir. 1969) (in banc). *Bennett* involved a challenge to his conviction by a defendant who assigned as error the exclusion of the public, pursuant to a state court rule, from a suppression hearing into the voluntariness of the defendant's confession. The hearing was held to comply with *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). *Bennett's* unusual fact situation resulted in the *Jackson* hearing being held after the jury had been selected, and the exact holding of the case is confined to those circumstances. We do not find the reasoning so confined, however, and the analysis used by the court in *Bennett* is a useful guide in the consideration of this appeal.

The court in *Bennett* began by noting how a *Jackson* hearing differed from a full trial: it was a preliminary proceeding to determine the admissibility of evidence, and not an inquiry into the guilt or innocence of the defendant; it was often held before a different judge than the one who was to preside at trial; and the testimony of the defendant at the *Jackson* hearing could not be used against him if he refused to testify at the full trial. *Bennett v. Rundle,* 419 F.2d 599, 605 (3d Cir. 1969) (in banc).

The court went on to say, however, that the *Jackson* suppression hearing "differe[d] strongly from those incidental or collateral discussions outside the presence of the jury," such as side bar conferences on points of law or conferences in chambers, from "which it has been held the public may be excluded." *Id.* The court found that the *Jackson* hearing had "more of the characteristics of a testimonial hearing, which is the essence of a trial proceeding." *Id.* The witnesses were sworn, they were subject to cross examination. There was strong pressure on each side: on the government to justify its actions in obtaining the confession and to rebut the charges of coercion; and on the defendant to obtain suppression of the confession.

Such a hearing, with conflicting credibility in issue and factual findings of the judge the ultimate outcome, is in every respect equivalent to a trial proceeding except that the jury necessarily is excluded from it, since its purpose is to have the judge determine whether the confession should be permitted to go to the jury.

*Id.* (footnote omitted).

Accordingly, the court turned to "the purposes and policy underlying the requirement of a public trial" to see if they applied to the *Jackson* suppression hearing. *Id.* It identified "the basic elements in policy underlying the guarantee of a public trial" as being to prevent abuse in the exercise of judicial power, to discourage perjury, and to allow unknown witnesses the opportunity to make themselves known. *Id.* at 606.

The court found these "policy aspects [to] have significant application" to the *Jackson* suppression proceeding. It found it "especially important to have public knowledge of claims of police coercion or disregard" of the constitutional rights of the defendant. And it held it to be "equally important that the testimony of police officers regarding police conduct which usually occurs more or less in private . . . should not be given in secret." *Id.* Accordingly, the court held the *Jackson* hearing to be subject to the sixth amendment's public trial provision.

[T]he desirability of the public exposure of the claims and denials of coerced confessions, the policy that judicial proceedings be under the scrutiny of the general public in order to avoid judicial oppression and to discourage perjury, and the provision for the possibility that one who has valuable information might stray into the courtroom as a spectator and hear the proceeding, are all as relevant to a *Jackson v. Denno* hearing as to a full trial.

*Id.*

Other courts have relied on our opinion in *Bennett* to extend the protections of the sixth amendment's public trial guarantee to pretrial hearings to suppress evidence. In *United States v. Lopez*, 328 F.Supp. 1077

(E.D.N.Y.1971), for example, the court cited *Bennett* in holding that a pretrial hearing at which the defendant sought to suppress narcotics seized from him by the police was subject to the sixth amendment "public trial" provision. The court said that the "right to a public trial attaches at the suppression hearing—often the crucial stage." *Id.* at 1087. *See United States v. Clark,* 475 F.2d 240, 247 (2d Cir. 1973) (approving *Lopez* ).

██ We also believe *Bennett* to be persuasive authority that the policies underlying the sixth amendment provision require that the pretrial suppression and *Starks* hearing held in this case be subject to that amendment's public trial guarantee.

The proceeding below had the "characteristics of a testimonial hearing, which is the essence of a trial proceeding." *Bennett v. Rundle,* 419 F.2d 599, 605 (3d Cir. 1969) (in banc). As in the *Jackson* hearing at issue in *Bennett,* the witnesses were sworn, and they were subject to cross-examination. The pressures on the parties in both hearings were similar. There was pressure on the government to justify the procedures it used to obtain Domenico's consent and to rebut the charges of coercion, in order to meet the *Starks* burden and defeat the suppression motion. And there was pressure on the defendant to obtain suppression of the evidence. Credibility was in issue. The outcome rested upon factual determinations by the trial judge. Except for the necessary absence of the jury and some relaxation in the applicable rules of evidence, the *Starks* and suppression hearing was in form the equivalent of a full trial.

As such, only by bringing the hearing within the ambit of the public trial provision can the important policies underlying that provision be served. A pretrial *Starks* and suppression hearing is often the critical stage in a criminal prosecution. If the government cannot meet its *Starks* burden, or if the evidence is otherwise suppressed, the government may be forced to drop the entire case for want of sufficient evidence to convict. Certainly it may face diminished chances of success at trial. Similarly, if the defendant fails to have the evidence excluded he may face certain defeat at trial, and so choose to enter a guilty plea in hopes of obtaining a lighter sentence. *See, e. g., United States v. Clark,* 475 F.2d 240, 247 (2d Cir. 1973).

██ To exempt pretrial suppression hearings of the type involved here from the public trial provision thus raises the possibility that critical proceedings will be insulated from public view without a showing sufficient to overcome the sixth amendment's requirements. Where decisions crucial to the outcome of the entire criminal case are made at such proceedings, all of the policies outlined above in support of the open trial requirement apply with full force: the need to make the trial accessible to unknown parties who might have important knowledge to bring to light, the need to subject the judiciary to public scrutiny in the performance of its duties, and the need to provide the "appearance of justice" in order to foster confidence in the judicial system.

Moreover, often the only time that police conduct is scrutinized in public is at a suppression hearing. The public has a vital interest in learning about the conduct of law enforcement officers, especially where allegations of coercion and invasion of constitutionally and congressionally protected rights are made.

These interests are strengthened where the interception of private conversations by surreptitious means is involved. Congress has recognized the need to protect the private conversations of all citizens from electronic interception except in the most limited and controlled circumstances. Where there are allegations that the police have violated Congress's commands in this area, all citizens have a strong interest in learning the facts. This is especially true since electronic surveillance, like much other police conduct, takes place in secret, veiled from the view of ordinary citizens. Suppression proceedings that test the legality of police conduct in recording the private conversations of citizens accordingly should be subject to the public trial requirement.

*United States v. Clark,* 475 F.2d 240, 247 (2d Cir. 1973).

As important as the actual prevention of judicial abuse or perjury at such hearings is the preservation of the appearance of justice. Secret hearings—though they be scrupulously fair in reality—are suspect by nature. Public confidence cannot long be maintained where important judicial decisions are made behind closed doors and then announced in conclusive terms to the public, with the record supporting the court's decision sealed from public view.

It is especially important that the appearance of justice be preserved in the prosecution of Henry Cianfrani. The defendant here was a prominent politician who at all times during the suppression hearing retained his public offices and positions of political power. He was charged with crimes concerning his conduct as a public official and political leader. Prosecutors, police, and even the judiciary are part of the political system of this country. It is thus vital that proceedings affecting the prosecution of a public figure such as the defendant be held in open court as a general rule, where each citizen who chooses to attend or read about the proceedings may evaluate the case on his or her own. This need is emphasized in the case of suppression proceedings, since the result may be the exclusion of trustworthy—and often damning—evidence against the accused for technical reasons not always readily comprehensible to laymen.[4]

## IV.

## PERMISSIBLE LIMITATIONS ON ACCESS.

The policies underlying the sixth amendment's public trial guarantee thus require that there be a strong presumption of public access to the pretrial *Starks* and suppression hearings held in this case. Most courts agree, however, that this presumption of access may be limited in certain circum-

stances. But few courts have agreed on when such limitations are permissible.

The defendant believes that his sixth amendment fair trial rights, coupled with his interests in protecting the privacy of his conversations, required closure of the pretrial hearing and sealing of the record. It is unclear whether he goes so far as to assert an absolute right under Title III and the sixth amendment to compel closure, or whether he relies only on the exercise of discretion by the trial court to do so. At the least, he believes that the district court's finding that prejudicial publicity resulting from an open hearing would be likely to reach potential jurors is a sufficient basis upon which this court might affirm the lower court's order.

Implicit in the defendant's position is the belief that the public trial provision of the sixth amendment is for the protection of the accused only. As a consequence, he maintains that the hearing should be closed at the request of a defendant, and that the record should be sealed whenever the sixth amendment fair trial interests of the defendant require it.

The court below relied on different reasoning to justify its order. The court required a showing of a clear and present danger to the fair trial rights of the defendant to overcome the presumption of access required by the first amendment, a showing that the court did not believe the defendant had made in this case. But the court apparently found that this same right of access dissolved in the face of Title III. It read that statute to require the total exclusion of the public, but did so without considering how such an order of exclusion might infringe on any constitutional requirements of access to court proceedings.

The sixth amendment does not require that all proceedings subject to its public trial provision be held in open court in all circumstances. There are permissible

4. At oral argument in this case, the parties brought to our attention the decision in *Gannett Co., Inc. v. DePasquale,* 43 N.Y.2d 370, 401 N.Y.S.2d 756, 372 N.E.2d 544 (1977). We have studied the opinion of the New York State Court of Appeals in *Gannett Co.,* and we find its analysis of the sixth amendment unacceptable.

limitations on public access to adjudicative proceedings. *E. g., Lloyd v. Vincent,* 520 F.2d 1272, 1273–74 (2d Cir.), *cert. denied,* 423 U.S. 937, 96 S.Ct. 296, 46 L.Ed.2d 269 (1975); *see Bennett v. Rundle,* 419 F.2d 599 (3d Cir. 1969) (in banc). But neither the district court nor the defendant identified correctly the principles governing exceptions to the sixth amendment public trial requirement, or how those principles should be applied in the circumstances of this case.

### A.

The defendant begins his argument from the premise that he was entitled to waive his right to a public trial. He asserts that he waived that right when he moved to close the hearing and seal the record because he believed that otherwise he would be unable to receive a fair trial. The defendant argues that for a court "[t]o deny the right of waiver in such a situation would be 'to convert a privilege into an imperative requirement' to the disadvantage of the accused." *United States v. Sorrentino,* 175 F.2d 721, 723 (3d Cir.) (footnote omitted), *cert. denied,* 338 U.S. 868, 70 S.Ct. 143, 94 L.Ed. 532 (1949), *quoting Patton v. United States,* 281 U.S. 276, 298, 50 S.Ct. 253, 74 L.Ed. 854 (1930).

 It is true that a defendant may waive his right to attack his conviction on the ground that he was denied a public trial, and the *Sorrentino* case so decided. But it is also true, contrary dictum in *Sorrentino* notwithstanding, that the same defendant has no absolute right to compel a private trial. Decisions construing the public trial provision of the sixth amendment have recognized that a motion "for a private hearing generally includes a consideration of the public's interest as well as the defendant's," since the public trial requirement is "for the protection of the public generally" as well as of the accused. *United States v. American Radiator & Standard*

*Sanitary Corp.,* 274 F.Supp. 790, 793, 794 (W.D.Pa.1967).

> [T]he right thus accorded to members of the public to be present at a criminal trial . . . has been imbedded in our Constitution as an important safeguard not only to the accused but to the public generally.

*United States v. Kobli,* 172 F.2d 919, 924 (3d Cir. 1949) (in banc).

 Though the sixth amendment by its terms guarantees a public trial only to the "accused," we believe that any deviation from the constitutionally established norm of open proceedings implicates important societal interests. The policies identified by the courts and commentators as underlying the public trial provisions of the sixth amendment serve important societal interests that are often separate from—and in some cases antagonistic to—the interests of a defendant in a particular criminal case. Because these larger interests underlying the sixth amendment are "of critical importance to our type of government in which the citizenry is the final judge of the proper conduct of public business," *Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469, 495, 95 S.Ct. 1029, 1046, 43 L.Ed.2d 328 (1975), the decision to exclude the public from court should not be made without consideration of those interests.[5]

We have previously in this opinion alluded to the interests supporting the sixth amendment, but because of their importance they bear repetition in resolving this issue.

 The protection against perjury that a public trial provides, as well as the opportunity that open proceedings afford to unknown witnesses to come forward with important testimony, serve not only the defendant's but all society's interest in having prosecutions decided on only truthful and

---

**5.** The Supreme Court similarly has recognized the public interest in preserving the sixth amendment's right to a jury trial when it upheld the requirement of *Fed.R.Crim.P.* 23(a) that any waiver by a defendant of his right to a jury trial is conditioned upon the approval of the court and the consent of the government. *Singer v. United States,* 380 U.S. 24, 34–36, 85 S.Ct. 783, 13 L.Ed.2d 630 (1965). *See Patton v. United States,* 281 U.S. 276, 312, 50 S.Ct. 253, 74 L.Ed. 854 (1930).

complete records. Indeed open proceedings guard as much against the perjury of the defendant and his witnesses as against the perjury of those who testify against him. And the unknown witness, or the bystander who reacts to false testimony, may give information damaging to the defendant as often as he gives testimony in defendant's favor.

■ Moreover, open trials are in part, based on our concern that non-parties who nevertheless have a stake in the litigation need an opportunity to observe the course of the trial or read accounts of it in the press. This is part of our larger concern that our judicial system preserve the "appearance of justice" by revealing for all to evaluate the testimonial and evidential bases upon which judicial determinations are founded. This opens the processes of government to the citizenry, and builds confidence in the judicial system.

The public has an independent right to be present to see that justice is fairly done. It is important that our citizens be free to observe court proceedings to insure a sense of confidence in the judicial process. Conducting trials behind closed doors might engender an apprehension and distrust of the legal system which would, in the end, destroy its ability to peacefully settle disputes.

*United States v. Lopez*, 328 F.Supp. 1077, 1087 (E.D.N.Y.1971).

■ Indeed, the check on judicial abuse that public proceedings provide is important beyond the protection it gives the accused against unjust treatment. It may be witnesses or non-parties whom the judge abuses, and the conduct of that judge may reveal much about his fitness to fill his office even though his acts do not prejudice the defendant in any way. Or it may be the defendant himself who is the beneficiary of the misdeeds of a biased or corrupt judge: "for a secret trial can result in favor to as well as unjust prosecution of a defendant." *Lewis v. Peyton*, 352 F.2d 791, 792 (4th Cir. 1965). Thus a defendant may have great incentive to secure a secret hearing in hopes that a corrupt or incompetent judge might favor him secretly. As Bentham noted:

matters might easily be so arranged, as that the acquittal of the defendant, though guilty, might be the result; and this without being productive of any of that disrepute, which would naturally attach upon the conduct of the judge who should give impunity to a malefactor whose guilt was written in legible characters upon the face of the evidence.

1 *J. Bentham, Rationale of Judicial Evidence* 576 (London, 1827).[6]

■ Further, open trials are an important way in which the public learns of the conduct of law enforcement officers. The defendant may not be concerned with the same aspects of police conduct that concern the public, or he may even seek to conceal police misdeeds favorable to his own case. It is thus important that the public's interest in learning of official conduct not unjustifiably be overlooked in accommodating the defendant's asserted interest in a closed proceeding.

■ We believe that the foregoing discussion demonstrates that the public trial provision of the sixth amendment serves

6. It is doubtful that at common law the requirement that trials be held in public grew up as a right of the accused at all. In earliest times, the public was expected to attend court proceedings: "Anglo-Saxon trials were held in the open and all freemen had a duty to attend and to participate in the trials." Note, *The Right to a Public Trial in Criminal Cases,* 41 *N.Y.U.L. Rev.* 1138, 1138 n.1 (1966).

In Radin, *The Right to a Public Trial,* 6 *Temple L.Q.* 381 (1931), the author noted that since at common law the accused enjoyed almost no rights, "it is more than doubtful that it was the prisoner's interest which created the practice" of holding open trials. *Id.* at 384. In speaking of Blackstone and Hale, the author said that those authors were "scarcely thinking of the privileges of the accused, but of the effectiveness of the process of trial" when they wrote about the value of open proceedings. *Id.*

Of course, the right to public trial is firmly fixed in the sixth amendment as an important right of the accused. Nevertheless examination of the common law roots of that amendment strengthens the belief that the public trial requirement is not designed to benefit the accused exclusively.

"not only to protect the accused but to protect as much the public's right to know what goes on when men's lives and liberty are at stake." *Lewis v. Peyton,* 352 F.2d 791, 792 (4th Cir. 1965). As such it is an expression of our concern that "justice cannot survive behind walls of silence," *Sheppard v. Maxwell,* 384 U.S. 333, 349, 86 S.Ct. 1507, 1515, 16 L.Ed.2d 600 (1966), even when those walls are erected at the behest of the defendant.

As we stated above, there are indeed circumstances in which public access may be limited to proceedings subject to the public trial guarantee of the sixth amendment. In determining when circumstances permit such limitations, however, the court must not lose sight of the important public interests served by open proceedings.

■■■ We hold that any motion that seeks to close any portion of a proceeding subject to the public trial requirement of the sixth amendment, or to seal any portion of the record thereof, may be granted only after full and fair consideration by the court of the important public policies that the sixth amendment protects. This is required even though it be the defendant who seeks to exclude the public.

■■■ In practical terms, this means "that any claim of practical justification for a departure from the constitutional requirement of a public trial must be tested by a standard of strict and inescapable necessity." *Bennett v. Rundle,* 419 F.2d 599, 607 (3d Cir. 1969) (in banc). This is necessary to insure that "[i]t is only under the most exceptional circumstances that [even] limited portions of a criminal trial may be even partially closed." *Stamicarbon N. V. v. American Cyanamid Co.,* 506 F.2d 532, 542 (2d Cir. 1974).

■■■ Moreover, we hold that any order of exclusion must extend no farther than the circumstances strictly warrant in order to meet the asserted justification for closure. *United States v. Ruiz-Estrella,* 481 F.2d 723, 725 (2d Cir. 1973). Thus, only that portion of the public may be excluded for only that portion of the proceeding that

the court finds to be strictly and inescapably necessary to protect the interests asserted by the defendant in support of his motion to close a hearing subject to the public trial requirement.

### B.

■■■ Not every interest asserted by a defendant in support of a motion to close a hearing subject to the public trial requirement will be sufficient to overcome the strong presumption in favor of public proceedings. The interests asserted in support of a motion to exclude the public must be sufficiently weighty to justify such exclusion in the face of the policies that underlie the sixth amendment's guarantee. We therefore turn to the justifications offered in this case.

The district court found that Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510 *et seq.,* required closure of the hearing below. It based this finding on the strong congressional intent it detected in the act to afford maximum protection against public disclosure to private conversations, and applied the act's provisions accordingly. Because it found disclosure to be authorized only after a determination that the interception of the communications at issue had been lawful, and even then only if disclosure occurred at the full trial on the ultimate issue of guilt or innocence, the court entered the closure order at issue.

The defendant supports the district court's position that Title III's provisions, read in light of Congress's overriding concern for privacy, required closure of the suppression hearing in order to guard against the disclosure of unlawfully intercepted conversations. The defendant goes on to argue that even after the district court determined that the communications met the *Starks* requirements, it was correct in sealing the record because of the need to protect the defendant's sixth amendment right to a fair trial. Otherwise, the contents of the record of the hearing would have reached potential jurors, even though the communications themselves might not

have been offered by the government at trial, or if offered, might have been ruled inadmissible.

 Title III is a comprehensive statute designed to regulate strictly the interception and disclosure of wire and oral communications. It "has as its dual purpose (1) protecting the privacy of wire and oral communications, and (2) delineating on a uniform basis the circumstances and conditions under which the interception of [such communications] may be authorized." *S.Rep. No.* 1097, 90th Cong., 2d Sess., *reprinted in* [1968] *U.S.Code Cong. & Admin.News,* pp. 2112, 2153. The legislative history of Title III makes it clear, as do the elaborate authorization and disclosure provisions of the statute itself, that "the protection of privacy was an overriding congressional concern" of the act. *Gelbard v. United States,* 408 U.S. 41, 48, 92 S.Ct. 2357, 2361, 33 L.Ed.2d 179 (1972) (footnote omitted) (decided together with a case on certiorari to this circuit, *United States v. Egan, id.*).

Indeed, Title III's complex provisions regulate both interception and disclosure of communications in great detail. The statute legalizes interceptions conducted pursuant to the authorization provisions of § 2516 and § 2518. In addition, it specifically exempts from those provisions only certain limited categories of interceptions. One of those exempted categories comprises interceptions "where one of the parties to the communication has given prior consent to [the] interception," which the statute declares "shall not be unlawful," § 2511(2)(c). Any interceptions other than those authorized by § 2516 and § 2518 or excepted by § 2511 are declared illegal.

Title III contains a strict exclusionary rule at § 2515. That provision prohibits the use of the contents of any communication, or any evidence derived therefrom, "in any trial, hearing, or other proceeding in or before any court . . . if the disclosure of that information would be in violation of this chapter." What disclosures are in violation of the chapter are defined by § 2518(10)(a). That section "provides the remedy for the right created by section 2515," *S.Rep. No.* 1097, 90th Cong., 2d Sess., *reprinted in* [1968] *U.S.Code Cong. & Admin.News,* pp. 2112, 2195, by giving persons who were targets of an interception the right to move to suppress such interceptions, and any evidence derived therefrom, "on the grounds that—(1) the communication was unlawfully intercepted."

Title III affirmatively provides for the disclosure of intercepted communications only in certain carefully limited instances. Public disclosure [7] with limited exceptions,[8] is authorized only in accordance with § 2517(3):

> Any person who has received, by any means authorized by this chapter, any information concerning a wire or oral communication, or evidence derived therefrom intercepted in accordance with the provisions of this chapter may disclose the contents of that communication or such derivative evidence while giving testimony under oath or affirmation in any proceeding held under the authority of the United States or of any State or political subdivision thereof.

18 U.S.C. § 2517(3). The legislative history explains that what may be disclosed within § 2517(3) are those communications that were not "unlawfully intercepted" within the meaning of § 2518(10)(a). *S.Rep. No.* 1097, 90th Cong., 2d Sess., *reprinted in*

---

7. Title III also provides for limited non-public disclosure. Disclosure by one law enforcement officer to another, and use of a communication by a law enforcement officer in the performance of his duty, are authorized if such disclosure or use is appropriate to the "proper performance of the official duties of the officer." §§ 2517(1), (2).

8. Section 2511 provides for limited disclosure in circumstances not relevant to this appeal: by switchboard operators, by employees of communications common carriers, or by employees of the Federal Communications Commission, where necessary in the performance of their duties, §§ 2511(2)(a)(i), (b); and by the President where necessary to fulfill his national security responsibilities, § 2511(3).

**856**

[1968] *U.S.Code Cong. & Admin.News,* pp. 2112, 2195.[9]

Title III thus authorizes the disclosure only of certain communications at a suppression and *Starks* hearing: those intercepted in accordance with the authorization procedures of § 2516 and § 2518, or else those intercepted under one of the exceptions to § 2516 and § 2518 contained in § 2511.

██ ˌ The statute clearly prohibits disclosure at the suppression hearing of communications not intercepted in accordance with the act or one of the exceptions. But Title III does not by its terms say whether a communication not yet determined to have been lawfully intercepted may be disclosed at a *Starks* and suppression hearing, where the very purpose of that hearing is to determine whether the communication was lawfully intercepted.

In this case, the government's *Starks* motion sought to obtain, inter alia, a pretrial determination that the interceptions at issue were recorded with the consent of Domenico or Gagliardi, and thus within Title III's consent exception. The government made no representations that the communications were intercepted in accordance with the authorization requirements of § 2516 and § 2518, or that the interceptions fit within any of the exceptions other than the consent exception. The communications at issue were on their face within the ambit of the act, since they arguably were oral and wire communications as defined by the statute, § 2510(1), (2). Thus, if the government could not prove by clear and convincing evidence that the recordings had been made with the consent of Domenico or Gagliardi, the court would have been forced to have found the recordings to have been unlawfully obtained and therefore non-disclosable and inadmissible.

When the defendant put the government to its proof on the *Starks* elements, the district court was faced with the prospect that the government, in presenting its case at the pretrial hearing, would seek to disclose the interceptions at issue. Thus, the possibility existed that the court would rule on whether the tapes had been lawfully intercepted—and thus whether they could be publicly disclosed at all—after the tapes had already been made public. To avoid this anomaly, the district court issued the order closing the hearing and sealing the record.

Congress's overriding interest in protecting privacy to the maximum extent possible is evident in Title III. The legislative history of the statute emphasizes the concern of its drafters that the Act preserve as much as could be preserved of the privacy of communications, consistent with the legitimate law enforcement needs that the statute also sought to effectuate. Similarly, the complex and overlapping provisions are strong evidence that Congress intended to regulate strictly disclosure of intercepted communications, limiting the public revelation of even interceptions obtained in accordance with the Act to certain narrowly defined circumstances.

Moreover, protection of the privacy of communications is vital to our society. We depend upon the free interchange of ideas and information. And we are dedicated to the proposition that each individual should be free from unwarranted intrusion into his private affairs. Both these interests are threatened by modern techniques of electronic surveillance, however, since it is now possible to record surreptitiously the most intimate conversations and to preserve them for later disclosure. Only by governing strictly both authorization and disclosure of intercepted communications did Congress believe that such weighty interests could be protected adequately.

██ We believe that the interest in protecting the privacy of communications is sufficiently weighty to justify some limitations in certain circumstances on the gener-

---

**9.** Title III also makes it a crime to disclose willfully the contents of any communication that the person disclosing knows, or has reason to know, was intercepted in violation of Title III. § 2511(1)(c). A civil remedy is provided to allow recovery of damages for the unauthorized disclosure of intercepted communications. § 2520.

al right of access to court proceedings. And we believe that the circumstances of this case present the required strict and compelling necessity to justify a limitation on public access to the hearing held below. Only by allowing such limitations can we effectuate the congressional concerns evident in Title III and preserve the strength of that statute's provisions governing disclosure.

■ We therefore hold that the district court should have prohibited the public disclosure at the *Starks* and suppression hearing held in this case of only the contents of any intercepted communication, or any evidence derived therefrom, prior to the determination by the court that such communication was intercepted lawfully, *i. e.*, intercepted either in accordance with the authorization requirements of § 2516 and § 2518 of Title III or under one of the explicit exceptions to those provisions.[10]

The Supreme Court similarly has interpreted Title III to give maximum protection to the privacy interests that underlie the act. For example, in *Gelbard v. United States*, 408 U.S. 41, 92 S.Ct. 2357, 33 L.Ed.2d 179 (1972), the Court held that persons called before a grand jury could defend against contempt proceedings growing out of their refusal to answer that grand jury's questions on the ground that those questions were based on illegally intercepted communications. In the circumstances of the case now before us, to allow the disclosure of communications that the act prohibits from disclosure would go farther "to thwart the congressional objective of protecting individual privacy by excluding such evidence," *id.* at 51, 92 S.Ct. at 2363, than did the more attenuated use of non-disclosable information condemned in *Gelbard*. *Accord, U. S. v. Giordano*, 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974).

We need not go so far as did the district court and find that Title III created a privilege against disclosure of all intercepted communications except at trial, and then only if such communications previously were determined to have been legally obtained. We hold only that in the circumstances of this case, a limited exception to the rule of public access to the hearing is required. Accordingly, we need not reach the correctness of the lower court's somewhat unusual reading of the provisions of Title III.

■ Though we agree with the court below that some protection against disclosure was required at the hearing, we think the court's order was too broad. Title III's provisions and policies require us to protect against the disclosure of the contents of communications that may have been intercepted in violation of the law. Here, however, the lower court closed the entire hearing and sealed the entire record. Such broad action was not necessary to meet the requirements of Title III.

Examination of the record of the *Starks* and suppression hearing reveals that very little of the testimony at that hearing touched in any way upon the contents of the communications at issue. Indeed, most of the hearing consisted of testimony by the two FBI agents or by Domenico about the circumstances under which consent was obtained, or the manner in which the recordings were actually intercepted. Only a small portion of the hearing concerned the contents of the tapes themselves. The public could have been admitted to almost the entire proceeding without there having been any risk of disclosure of the contents of the communication.

---

**10.** Title III requires such limitations even where interceptions allegedly obtained by consent are at issue. Intervenors argue that Title III does not govern the disclosure of consensually intercepted communications. They assert that the explicit exemption of consent interceptions from the authorization requirements of the act contained in § 2511(2)(c) implicitly exempts such interceptions from disclosure restrictions as well. We express no opinion on whether interceptions obtained by consent are exempt from the disclosure restrictions of the act once they have already been determined to have been intercepted by consent. See text accompanying note 14 *infra*. But we do believe that prior to that determination, Title III requires limitations on disclosure in order to insure that non-consent—and therefore illegal—interceptions are not disclosed.

Because any limitation on the sixth amendment's public trial requirement must be narrowly confined, we believe it was error for the court to have excluded the public from any more of the suppression hearing than was reasonably necessary to prevent disclosure of the contents of the communication at issue, or any evidence derived therefrom.[11] Based upon our examination of the transcript of the hearing, we believe the district court easily might have excluded the public from only that short and discrete portion of the hearing during which the tapes were played, and so provided for adequate protection against disclosure of the communications.

We realize, of course, that we speak with the benefit of hindsight. We would not, even if we could, lay down any hard and fast rules governing exactly when such hearings should be closed or for how long. That decision will be for the district courts to make in the first instance as the circumstances of each case require. We note in particular that it may be difficult in the circumstances of a given case to determine what constitutes the contents of the communication, or what evidence was derived therefrom. We emphasize only that in making such decisions, the courts should be alert to limit incursions on the right of public access to the extent and duration strictly and inescapably necessary to prevent the disclosure of the communication involved.

We note in this regard that the decisions reached in most suppression hearings do not turn upon the contents of the communication at issue but on factual and legal determinations concerning the circumstances of the interception that are unrelated to what was said to whom. Most of the *Starks* requirements themselves are concerned with the circumstances of the interception, such as the requirement concerning consent at issue in this case. Similarly, most motions to suppress communications allege a failure to comply with the warrant requirements of Title III, or—as in this case—argue that one of the exceptions to those requirements does not properly apply. Indeed, here the defendant himself argued that it was not necessary to play the tapes or to put the transcripts into evidence in order to decide the issue of consent. In many cases that may well be true. We make these observations not to restrict any party's leeway in the use of evidence, but to note that district courts should be able to fashion workable methods to accommodate the aims of protecting against unwarranted disclosure while preserving the principle of open proceedings.

The remedy of exclusion of the entire public was adopted by the district court in this case to effectuate the policies of Title III. In these circumstances, exclusion of everyone not directly involved for a limited period would have been a reasonable response to the problems confronting the court. We observe that there remains a wide variety of remedies available to district courts, from the use of headphones to restrict the number who are able to hear the recordings to pre-hearing agreements to limit references to the contents of the communications. We say this to emphasize that the remedy of exclusion of the public should not be viewed as a required, or even necessarily preferred, response to the problem the court faced below.[12]

---

11. The defendant does not argue, nor did the court below find, that the revelation of any information other than the contents of the communications would have violated the defendant's sixth amendment rights to a fair trial. Thus we need not consider whether there might be circumstances where a defendant's sixth amendment rights to a fair trial could be so jeopardized by pre-trial disclosure of such information as to permit some limitations on disclosure.

12. In a line of cases involving the disclosure of the federal government's secret "airplane hijacker profile," the United States Court of Appeals for the Second Circuit developed a limited exception to the public trial requirement similar to the approach we take in this case. In those Second Circuit cases, defendants seeking to suppress evidence sought access to the profile for the purpose of challenging the reasonableness of the search at issue. The courts, while holding that pretrial suppression hearings were indeed subject to the sixth amend-

■ Finally, we hold that when confronted with a *Starks* or suppression motion that involves communications arguably covered by Title III, the district courts should determine that any restrictions on public access they might approve are no broader than strictly and inescapably necessary to protect against the disclosure of the contents of the communications, or any evidence derived therefrom, prior to a determination that the communications were lawfully intercepted.

■ We thus believe it was error for the district court to have excluded the public from any more of the pretrial suppression and *Starks* hearing than reasonably would have been necessary to protect against the disclosure of the contents of the communications at issue, or any evidence derived therefrom, prior to the district court's decision to grant the government's *Starks* motion. At the same time, we believe that the narrow and in many cases temporary restrictions on public access that we approve are permissible limitations on the sixth amendment's public trial requirement.

### C.

The court below not only closed the hearing, it also sealed the resultant record until such time as the communications at issue were introduced into evidence at the full trial. The court did so in order to protect against what it feared might be the needless disclosure of private communications. Since the government might not have used the evidence at trial, or since the evidence might not have been admissible even if offered, the court believed that disclosure

even after the determination that the recordings had been obtained by consent could result in the needless publication of "privileged" communications.[13]

■ The court sealed not simply those portions of the record that contained the contents of the communication placed into evidence at the hearing, but rather the whole of the record including those parts that did not in any way touch upon the contents of the communications. That action was too broad to the extent that it barred public access to the record of that portion of the proceeding from which the public was improperly excluded. The district court may seal only that portion of the record which contains the part of the hearing from which the public permissibly may be excluded under our analysis.

■ Moreover, the district court sealed the record even though it had already granted the *Starks* motion. We believe that once the court determined the interceptions to have been lawful, the best course would have been for the court to make public as soon as reasonably possible the record of that portion of the proceedings from which the public was excluded. In this way, the incursion onto the public trial provision would have been most strictly limited.

■ Furthermore, public disclosure after a determination by the court that the interceptions had been lawfully obtained would not frustrate the purposes or provisions of Title III. Whether the disclosure of consensually obtained interceptions is

ment's public trial requirement, held that the need to preserve the secrecy of the profile justified the temporary exclusion of the public and the defendant. But the exclusion was carefully limited to only that period of the hearing during which the profile was to be disclosed: "We emphasiz[e] that the approval of the in camera procedure [was] limited to the exigencies at hand, i. e., the protection of the secret profile." *United States v. Ruiz-Estrella,* 481 F.2d 723, 725 (2d Cir. 1973). *See United States v. Slocum,* 464 F.2d 1180, 1184 (3d Cir. 1974).

13. In so ruling, the district court relied on the language of the original version of § 2517(3) to

bolster its position. As originally passed, § 2517(3) authorized disclosure only at "criminal proceedings." The district court read that language restrictively to mean that public disclosure was authorized only at the full trial, in order to afford maximum protection to the privacy interests involved. In 1970, however, § 2517(3) was amended to authorize disclosure at simply "any proceeding" in federal court, thus broadening the circumstances under which legally intercepted communications could be divulged in court. Pub.L. 91–452, Title IX, § 902(b), Oct. 15, 1970, 84 Stat. 947.

governed by Title III or not—a question upon which we express no opinion [14]—once the court determined that the tapes had been obtained by the consent of one of the parties disclosure was not forbidden by the Act. If consensual interceptions are indeed not within the Act's disclosure provisions, then the statute did not apply once the decision had been made that there had been valid consent. Alternatively, if the statute does govern the disclosure of even consensually obtained interceptions, disclosure by a witness under oath at the *Starks* and suppression hearing was authorized by § 2517(3) as being "at any proceeding held under the authority of the United States." 18 U.S.C. § 2517(3).

In this case, however, the defendant asserts that his sixth amendment rights to a fair trial would have been infringed by the release of the contents of the communications at issue, even though those communications were lawfully obtained. He argues that because of the extensive publicity given his case, potential jurors would be likely to learn of the communications even though such communications might never have been introduced against him at trial. He believes, therefore, that it was within the discretion of the trial court to seal the record in order to protect his interest in obtaining a fair trial. And since no prior restraint of the press was involved, but only a mere denial of access to evidence not yet introduced at trial, he says that such an order was permissible even without satisfying the standards of *Nebraska Press Association v. Stuart,* 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976).

■ There will be no trial in this case, however. And the information that the defendant says would have prejudiced him has already been released to the public. In these circumstances, there can be no prejudice to the defendant caused by the release of the entire sealed record, including the contents of the one recording that was placed on that record at the hearing. Accordingly, we do not reach the question of whether, in other circumstances, a defend-

ant's interest in obtaining a fair trial under the sixth amendment might justify the sealing of the record of those portions of the proceedings from which the public was properly excluded even after the determination by the court that the communications were lawfully intercepted.

### D.

The ACLU, as amicus curiae, argues that it would be a violation of the defendant's right to privacy to allow disclosure of intercepted communications except at the full trial on the ultimate issue of the defendant's guilt or innocence. We think that our holding under Title III permitting limited closure adequately protects any such privacy interests prior to the determination that the communications were lawfully intercepted.

■ The ACLU believes, however, that the Constitution protects against disclosure of private communications except at trial whether they were lawfully intercepted or not. Similarly, it relies on *United States v. Jackson,* 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968), to argue that disclosure of lawfully intercepted communications prior to trial impermissibly chills the defendant's exercise of his right to a fair trial by discouraging him from moving to suppress evidence he believes to have been illegally obtained. Amicus argues that a defendant will often forego the right to oppose a *Starks* motion, or to file his own suppression motion, in order to protect the privacy of his communications prior to the determination that they will be used at the full trial.

We find no merit in these contentions. This case involves consensually obtained interceptions. We have previously held that, whatever the contours of any constitutional right of privacy may be, there is no constitutionally protected expectation that the party to whom a communication is made will not repeat that communication, or will not consent to its being recorded and dis-

14. See note 10, *supra.*

closed at trial. *United States v. Santillo,* 507 F.2d 629, 634 (3d Cir.), *cert. denied,* 421 U.S. 968, 95 S.Ct. 1960, 44 L.Ed.2d 457 (1975). Therefore, even assuming that there exists a constitutionally protected right to privacy in certain circumstances, that right does not prohibit disclosure of the consensually obtained communications at issue in this case.

## V.

### THE FIRST AMENDMENT CLAIM.

By outlining the permissible limits on access to the pretrial suppression hearing held in this case, we have gone far to define the rights of the press in these circumstances as well. That is because it is well settled that the press enjoys the same rights of access to public proceedings that the public in general enjoys. And what the press is free to see and hear in open court, it is free to publish or report without restraint: "there is nothing that proscribes the press from reporting events that transpire in the courtroom." *Sheppard v. Maxwell,* 384 U.S. 333, 362–63, 86 S.Ct. 1507, 1522, 16 L.Ed.2d 600 (1965). "[O]nce a public hearing had been held, what transpired there could not be subject to prior restraint." *Nebraska Press Association v. Stuart,* 427 U.S. 539, 568, 96 S.Ct. 2791, 2807, 49 L.Ed.2d 683 (1976).

 Intervenors maintain, however, that even the limited and often temporary restrictions on access we have approved violate the press's first amendment freedom to gather and publish news, as well as the public's first amendment freedom to receive information.

 We cannot agree. "The right to speak and publish does not carry with it the unrestrained right to gather information." *Zemel v. Rusk,* 381 U.S. 1, 17, 85 S.Ct. 1271, 1281, 14 L.Ed.2d 179 (1964). Nor does the first amendment "guarantee the press a constitutional right of special access to information not available to the public generally. . . . [d]espite the fact that newsgathering may be hampered." *Branzburg v. Hayes,* 408 U.S. 665, 684, 92 S.Ct. 2646, 2658, 33 L.Ed.2d 626 (1971).

 In light of these principles, we do not believe it to be an infringement of the first amendment to limit access to a pre-trial suppression hearing in the manner we have approved. No prior restraint is involved. The press remains free to publish whatever it learns in open court or elsewhere. We therefore hold that the confined, in many instances temporary, and strictly regulated limits on access outlined above do not violate the first amendment rights of the press or of the public in general. *United States v. Gurney,* 558 F.2d 1202 (5th Cir. 1977), *petition for cert. filed,* 46 U.S.L.W. 3471 (U.S. Jan. 16, 1978) (No. 77–1010). *Central South Carolina Chapter, Society of Professional Journalists, Sigma Delta Chi v. Martin,* 556 F.2d 706 (4th Cir. 1977), *cert. denied,* —— U.S. ——, 98 S.Ct. 749, 54 L.Ed.2d 771 (1978) (No. 77–263).

## VI.

### CONCLUSION.

The judgment of the district court will be reversed, and the case remanded for further action consistent with this opinion. The district court should take immediate steps to make available to the public the record of the November 28 suppression and *Starks* hearing.

GIBBONS, Circuit Judge, concurring.

I join in the judgment and in all of Chief Judge Seitz's opinion except that part which predicates the right of access by the press to judicial proceedings upon the sixth amendment. I object to that analysis for two reasons. First, it is at least arguable that the plain text of the amendment precludes the use to which it has been put in the majority opinion. The sixth amendment reads in relevant part:

> In all criminal prosecutions, *the accused* shall enjoy the right to a speedy and public trial . . . .

(emphasis supplied).

The Constitution should not be interpreted so literally that it would be impossible to find, in the penumbra of the sixth amend-

ment, an interest in both the public and the press. The Supreme Court has recognized a public interest in the jury trial guarantee of that same amendment, *Singer v. United States,* 380 U.S. 24, 34–36, 85 S.Ct. 783, 13 L.Ed.2d 630 (1965), and has suggested that a similar analysis might apply to the public trial guarantee, *id.* at 35 (citing *United States v. Kobli,* 172 F.2d 919, 924 (3d Cir. 1949)). *But cf. Estes v. Texas,* 381 U.S. 532, 538, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965). Thus I agree with the proposition that the sixth amendment protects public as well as defendant interests, although I am not certain that such a doctrine will achieve general acceptance.

My second reason is more fundamental. The sixth amendment applies only to criminal prosecutions. The valuable access rights of the press which Chief Judge Seitz recognizes, and which I fully agree it possess, are not confined to access to criminal prosecutions. The judicial process, civil and criminal, is presumptively in the public domain. It is so because it is a part of the entire political process by which a self-governing democracy governs. To be sure, the operation of the judicial process in civil cases is often of no significance to anyone other than the litigants. But that is not always the case. *Dred Scott v. Sandford,* 60 U.S. (19 How.) 393, 15 L.Ed. 691 (1857), *Plessy v. Ferguson,* 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896), and *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), are examples of civil cases in which the judicial process considered and decided political issues which were more profound and affected more lives than most legislation. The public's right of access to the proceedings in these and similar cases is, in my view, at least as important as is the right of access to criminal proceedings.

Protection of that right of access, to the extent recognized in Chief Judge Seitz's opinion, should rest upon a broader constitutional foundation than is afforded by the sixth amendment. That foundation, I suggest, is the federal common law implied from the first amendment. Moreover, the public access right has a constitutionally

protected minimum content. As Justice White observed:

> Public [court] records by their very nature are of interest to those concerned with the administration of government, and a public benefit is performed by the reporting of the true contents of the records by the media. The freedom of the press to publish that information appears to us to be of critical importance to our type of government in which the citizenry is the final judge of the proper conduct of public business. In preserving that form of government the First and Fourteenth Amendments command nothing less than that the States may not impose sanctions on the publication of truthful information contained in official court records open to public inspection.

*Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469, 495, 95 S.Ct. 1029, 1046, 43 L.Ed.2d 328 (1975). The *Cox Broadcasting* case does not, of course, tell us what records or proceedings *must* be open. It does suggest, however, that the public's right to be informed about the conduct of judicial proceedings rests upon the broader constitutional foundation of the first amendment and is therefore equally applicable to civil and to criminal proceedings. Nothing in either *Pell v. Procunier,* 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974), or *Branzburg v. Hayes,* 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), suggests a contrary interpretation of the first amendment. Both recognize that the press enjoys no greater right of access to information than does the public generally. Neither, however, suggests that there is no constitutionally protected right of public access, at least to the extent we have in this case recognized it, to information about how one of the three great political branches of our government conducts its business. A decision by Congress or a state legislature to conduct all its business in secret would, I think, run afoul of the first amendment. Similarly, a decision by the judiciary to conduct all its business in secret would not be immune from first amendment scrutiny. Applying that scrutiny in this case, for the

policy reasons set forth in Chief Judge Seitz's opinion, I agree fully with the disposition he has arrived at.